ESTATE OF Bessie Mae BIRDWELL, Deceased, By and Through Its Independent Administrator, David W. BIRDWELL, and David W. Birdwell, Individually, Appellants,

v.

TEXARKANA MEMORIAL HOSPITAL, INC., d/b/a Wadley Regional Medical Center, Appellee.

No. 06–02–00131–CV.

Court of Appeals of Texas, Texarkana.

Submitted Dec. 4, 2003.

Decided Dec. 12, 2003.

Rehearing Overruled Dec. 30, 2003.

---

M. Mark Lesher, Monty G. Murry, Lesher & Murry, Texarkana, for appellants.

Jeffery C. Lewis, Louise Tausch, Atchley, Russell, Waldrop & Hlavinka, Texarkana, for appellee.

Before ROSS, CARTER, and HADDEN,* JJ.

## OPINION

Opinion by Justice ROSS.

The Estate of Bessie Mae Birdwell, Deceased, by and through its independent administrator, David W. Birdwell, and David W. Birdwell, Individually, (the Estate) appeals the trial court's dismissal of their suit against Texarkana Memorial Hospital, d/b/a Wadley Regional Medical Center (Wadley), for the Estate's alleged failure to meet the expert report requirements set out in the former Medical Liability and Insurance Improvement Act. *See* Tex.Rev.Civ. Stat. Ann. art. 4590i, § 13.01 (Vernon Supp.2003).[1]

### Factual and Procedural Background

Birdwell was hospitalized at Wadley June 11, 1998, with multiple medical problems, including a blood clot and pulmonary embolism. She had a relatively uneventful hospital stay, until June 16, 1998, when she was found on the floor of her hospital room. Malcolm A. Smith, M.D., examined her and treated her for a skin tear and a small hematoma on the right side of her head, then discharged her from the hospital. Later that day, Birdwell developed a significant change in her mental status and was brought back to Wadley. She was given a CT scan and diagnosed with multiple intracranial hemorrhages. She remained paralyzed on her left side and in a diminished level of consciousness. She was discharged from the hospital September 21, 1998. She died January 29, 1999.

The Estate sued Wadley, Smith, and Collom & Carney Clinic Association for negligence and wrongful death. The Estate timely filed the expert report and curriculum vitae of Marsha E. Thigpen, M.D., as required by the Medical Liability and Insurance Improvement Act. Smith and Collom & Carney moved to strike the expert's report and dismiss the case against them with prejudice. The trial court granted the motion; no appeal was taken against those defendants. Wadley then moved to strike the expert's report and dismiss the case against it with prejudice. The trial court held a hearing and granted the motion. The Estate appeals, contending the trial court abused its discretion in determining the expert report it provided did not meet the requirements of the Medical Liability and Insurance Improvement Act.

---

* Roby Hadden, J., Sitting by Assignment.

1. This Act was repealed and recodified at Tex. Civ. Prac. & Rem.Code Ann. § 74.351 (effective September 1, 2003). This action was filed June 15, 2000, before the new Act's September 1, 2003, effective date.

## Standard of Review

 Dismissal of a cause of action under Article 4590i, Section 13.01 is treated as a sanction and is reviewed for an abuse of discretion. *See Am. Transitional Care Ctrs. v. Palacios*, 46 S.W.3d 873, 877 (Tex.2001). An abuse of discretion occurs when a trial court acts in an arbitrary or unreasonable manner or without reference to any guiding principles. *See Garcia v. Martinez*, 988 S.W.2d 219, 222 (Tex.1999). A trial court does not abuse its discretion simply because it may decide a matter within its discretion differently than an appellate court. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985). However, a trial court has no discretion in determining what the law is or in applying the law to the facts. Thus, "a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion, . . . ." *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex.1992).

## Expert Report Requirements

TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(d) requires a plaintiff asserting a healthcare liability claim to submit an expert report, along with the expert's curriculum vitae, as to each physician or healthcare provider named as a defendant in the suit, no later than the 180th day after filing suit. *See* TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(d). The Act describes an expert report as a written report providing "a fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX.REV. CIV. STAT. ANN. art. 4590i, § 13.01(r)(6).

 If a claimant furnishes a report within the time permitted, a defendant may file a motion challenging the report.

*See* TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(*l*). The trial court shall grant the motion only if it appears to the court, after a hearing, that the report does not represent a good faith effort to comply with the statutory definition of an expert report. *See id.; Palacios*, 46 S.W.3d at 877–78.

 If a report omits any of the statutory elements, it cannot be a good faith effort. *Palacios*, 46 S.W.3d at 879. A report that merely states the expert's conclusions about the standard of care, breach, and causation is not sufficient. *Id.* In determining whether the report represents a good faith effort, the trial court's inquiry is limited to the four corners of the report. *Id.* at 878.

 The expert report must set forth an applicable standard of care and a breach of that standard. TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(r)(6). The standard of care for a hospital is what an ordinarily prudent hospital would do under the same or similar circumstances. *Palacios*, 46 S.W.3d at 880. Identifying the standard of care is critical: whether a defendant breached its duty to a patient cannot be determined absent specific information about what the defendant should have done differently. *Id.* "While a 'fair summary' is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given." *Id.*

 The expert's report must also contain information on causation. It is not enough for a report to contain conclusory insights about the plaintiff's claims. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex.2002). Rather, the expert must explain the bases of the statements and link the expert's conclusions to the facts. *Id.* (*citing Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex.1999)).

*Analysis*

The Estate presented an expert report in letter form. Thigpen's letter, in its entirety, states:

After careful review of the clinic notes, hospital records, etc. on the above referenced patient, I offer the following observations. I reviewed Collom & Carney Clinic records and records from Wadley Regional Medical Center from April 15, 1998 through September 21, 1998. Based upon reasonable medical probabilities, it is my opinion that the nurses at Wadley and Dr. Malcolm Smith deviated from the appropriate standard of care while treating Bessie Birdwell and that this deviation from the appropriate standard of care was a cause of Ms. Birdwell's injuries suffered on June 16, 1998 as more fully explained.

The patient was an elderly female with multiple medical problems, including but not limited to multiple Transient Ischemic Attacks, Cerebrovascular Accident with resultant Seizure Disorder. Mrs. Birdwell developed another temporal bleed while on Coumadin in May 1998 and the Coumadin was stopped. Approximately one month later (hospitalization from 6/11/98–6/16/98), the patient developed a Deep Venous Thrombosis and Pulmonary Embolism. With the history of previous bleeds being contraindication to systemic Heparin, Mrs. Birdwelll received subcutaneous Heparin. A Greenfield filter was then placed to prevent further emboli.

The records indicate that Mrs. Birdwell had a relatively uneventful hospital course until the last few days of her stay. Multiple entries indicate the patient's confusion, disorientation and inability to learn safety procedures. During the last 48 hours of the 6/11/98–6/16/98 admission, the nurse's notes indicate the patient was found on the side of the bed on one occasion, and on the floor on another. The second occasion, the patient was face down on the floor, appearing stunned, and initially nonverbal. The attending physician was notified of this accident. The attending physician acknowledged the fall and the resultant 5 × 5 cm hematoma during his examination of the patient on 6/16/98. Although no detailed neurological examination was documented, the attending physician did state there was "no other evidence of trauma from fall" (the nurse's notes did indicate a finger skin tear). The attending physician's discharge instructions included continued subcutaneous Heparin and "ice to scalp PRN". No diagnostic studies appear to have been ordered. The hospital's discharge instructions did not appear to include head injury precautions. The patient was discharged at 12:52 PM on June 16, 1998.

Mrs. Birdwell later the same day developed a significant change in mental status and was brought to the Emergency Room (at 21:39 PM) for evaluation. The patient was then re-admitted. Work up at that time included a CT Scan of the head, which revealed: 1) multiple intracerebral areas of hemorrhage with a small amount of subarachnoid blood. 2) probable old infarct of the right cortical region of the parietal lobe. 3) encephalomalacia in the left temporal lobe due to previous hemorrhage. Further work up included a CT Scan of the neck, which revealed: 1) intramuscular hematoma involving the right sternocleidomastoid (consistent with trauma). Several physicians during this hospital stay documented the etiology of the current multiple hemorrhages as "probably posttraumatic".

As a result of the fall and multiple intracranial hemorrhages, the patient was

left obtunded and with a left hemiplegia. Mrs. Birdwell later developed Aspiration Pneumonia, ultimately requiring Endotracheal Intubation, and later tracheotomy. The patient also required a permanent feeding tube for nutritional support. Neurologically the patient showed some improvement prior to her discharge on 09/21/98.

With regard to the fall, it appears that some measures were taken to attempt to educate the patient regarding safety and to prevent falls. I have also reviewed the Wadley Regional Medical Center's Practice Guideline: Fall Precautions, and policy on use of restraints. The policy clearly states the standard of care is: "The patient will be provided an environment that is safe so that the patient is protected from injury during his/her hospital stay." The use of restraints is clearly outlined in the details of the policy. The patient's documented confusion, and inability to be taught, indicates a need for additional protection. The failure to provide this protection for Mrs. Birdwell was clearly below the medical center's own standard of care. Had additional measures been taken, the fall more likely than not could have been prevented. Due to the patient's documented history of Cerebral Bleeds, and the fact that the patient was receiving subcutaneous Heparin, it would have been prudent and within the standard of care to obtain a head CT Scan prior to discharge on 6/16/98. The attending physician did document that the patient had no evidence of trauma from the fall (other than a small hematoma). However, documentation of a thorough neurological examination would have been helpful.

It is evident from the documentation that the patient's debilitated condition as a result of the fall contributed to some of the adverse events late in the hospital course.

 To comply with the expert report requirement, a plaintiff must only make a good faith attempt to provide a fair summary of the expert's opinions. TEX.REV. CIV. STAT. ANN. art. 4590i, § 13.01(*l*); *Palacios*, 46 S.W.3d at 875. To constitute a good faith effort, the report must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question, and to provide a basis for the trial court to conclude that the claims have merit. *Palacios*, 46 S.W.3d at 875.

Thigpen's report states her opinions concerning the standard of care, the breach, and causation in these particulars:

*Standard of Care:*

> [T]he Wadley Regional Medical Center's Practice Guideline: Fall Precautions, and policy on use of restraints. The policy clearly states the standard of care is: "The patient will be provided an environment that is safe so that the patient is protected from injury during his/her hospital stay." The use of restraints is clearly outlined in the details of the policy. The patient's documented confusion, and inability to be taught, indicates a need for additional protection.

*Breach:*

> The failure to provide this protection for Mrs. Birdwell was clearly below the medical center's own standard of care.

*Causation:*

> As a result of the fall and multiple intracranial hemorrhages, the patient was left obtunded and with a left hemiplegia.... Had additional measures been taken, the fall more likely than not could have been prevented.... It is evident from the documentation that the pa-

tient's debilitated condition as a result of the fall contributed to some of the adverse events late in the hospital course.

We find the report is a good faith attempt to give a fair summary of the standard of care, the hospital's breach, and the injuries Birdwell suffered as a result of that breach. While the report does not provide a direct statement that the standard of care required the hospital to use restraints, that the hospital breached that standard of care by failing to use restraints, and that Birdwell's injuries were caused by that breach, the substance of Thigpen's report provided the hospital with fair notice of all those required elements. Magic words are not always used, but magical words are not necessary. *Wright,* 79 S.W.3d at 53. It is the substance of the opinions, not the technical words used, that constitutes compliance with the statute. *Moore v. Sutherland,* 107 S.W.3d 786, 790 (Tex.App.-Texarkana 2003, pet. denied). The substance of Thigpen's report gave fair notice to the hospital of (1) the standard of care, i.e., the standard of providing restraints to ensure an environment that is safe so that the patient is protected from injury; (2) what the hospital did wrong, i.e., the failure to provide restraints; and (3) the cause of Birdwell's hemorrhages and paralysis, i.e., her fall as a result of the failure to provide restraints as an additional fall precaution.

The expert report need not present evidence as if it were litigating the merits of the case. It may be informal, and the information presented need not meet the same requirements as evidence offered in a summary judgment proceeding or in a trial. *Palacios,* 46 S.W.3d at 879.

Wadley contends *Palacios* and *Wright* support its position that Thigpen's report is inadequate. In *Palacios,* however, there was no statement whatsoever in the expert

report as to what the standard of care was. There was only a statement that the medical care rendered to Palacios was below the accepted and expected standard of care. Here, Thigpen's report stated a standard of care which provided the hospital and trial court with information as to what the hospital specifically failed to do. That report provides that "[t]he policy clearly states the standard of care is: The patient will be provided an environment that is safe so that the patient is protected from injury during his/her hospital stay," and specifically states that "[t]he use of restraints is clearly outlined in the details of the policy." ("The policy" referenced is clearly the Wadley Regional Medical Center's Practice Guideline: Fall Precautions, and the policy on use of restraints.) Thigpen's report does not use the magic words "standard of care" and the words "use of restraints" in the same sentence, but the substance of the report provides a fair summary of the expert's opinion that the standard of care specifically required Wadley to use restraints in Birdwell's situation, and its failure to do so was a breach of that standard of care. *See Moore,* 107 S.W.3d at 790–91 (finding substance of expert's opinion gave fair notice to doctor and hospital that standard of care required them to make diagnostic evaluation for bile peritonitis). Therefore, the substance of Thigpen's report provides what the report in *Palacios* did not: a statement of what the hospital specifically failed to do.

In *Wright,* the Texas Supreme Court held that the expert report gave a fair summary of the standard of care and the breach of that standard, but held that the report did not fairly summarize causation because it was merely conclusory. Wright sustained injuries in a car accident. *Wright,* 79 S.W.3d at 50. While Wright was at the hospital, a physician's assistant x-rayed her right knee and foot, and diag-

nosed her with a fractured kneecap. *Id.* The physician's assistant, however, allegedly misplaced or misread the foot x-ray and did not discover that Wright had also fractured her right foot in the accident. *Id.* Nearly a month after the accident, Wright's orthopedic surgeon discovered her fractured foot. *Id.* By that time, the surgeon had already operated on her knee. *Id.* The Wrights claimed the surgeon could have operated on her foot at the same time as her knee had he known about the injury, but instead Wright had two additional surgeries over the next ten months. *Id.* The statement of causation in the expert report provided by the Wrights stated that, "if the x-rays would have been correctly read and the appropriate medical personnel acted upon those findings then Wright would have had the possibility of a better outcome." *Id.* at 51. As noted by the Texas Supreme Court, this statement did not summarize the causal relationship between the hospital's failure to meet the standard of care and the patient's injury because "the report simply opines that [Wright] might have had 'the possibility of a better outcome' without explaining how [the hospital's] conduct caused injury to [her]." *Id.* at 53. The court found the report lacked information linking the expert's conclusion (that the patient might have had a better outcome) to the hospital's alleged breach (that it did not correctly read and act on the x-rays) and, therefore, the trial court could have reasonably determined the report was conclusory. *Id.*

▬▬ In Thigpen's report, however, Wadley's alleged negligence in failing to provide restraints was linked to Birdwell's hemorrhages and left side paralysis. Wadley contends the statement in Thigpen's report, "[h]ad additional measures been taken, the fall more likely than not could have been prevented," does not address causation since it does not link any failure to meet the applicable standard of care to Birdwell's alleged injuries. Wadley argues, therefore, this statement, like the one in *Wright,* is conclusory as to how Wadley breached the standard of care and as to how that breach then caused injuries to Birdwell. As discussed above, the substance of Thigpen's report was that Wadley breached the standard of care by not providing restraints. The report provides that, had Wadley not breached the standard of care, Birdwell's fall "more likely than not" could have been prevented.[2] In addition, the report provides a link between Wadley's negligence and Birdwell's specific injuries where it states that "[a]s a result of the fall and multiple intracranial hemorrhages, the patient was left obtunded and with a left hemiplegia."

This report specifically states what Wadley should have done and what happened because it failed to do it. The statement of causation is not a conclusion or a statement of a mere possibility, as in *Wright,* but is a positive statement of fact: Had Wadley used restraints as an additional fall protection, it is more likely than not Birdwell would not have fallen and suffered intracranial hemorrhages and a left-sided paralysis. *See Moore,* 107 S.W.3d at 790–91 (finding causation statement in expert report that provided "[h]ad the diagnosis of bile peritonitis been made

**2.** The court in *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 53 (Tex.2002), found that "[n]othing in the Act's plain language, or in *Palacios,* suggests that, for these purposes, an expert report must express the causal relationship in terms of 'reasonable medical probability.'" Therefore, the causation statement in this case, which recognizes the causal relationship as "more likely than not," rather than "reasonable medical probability," is not defective for its failure to use the particular "magical words." *See id.* (use of "possibility" in expert report).

before discharge from the hospital, treatment would have prevented the patient's death," was not conclusion, but positive statement of fact).

## Conclusion

We find the expert's report gave Wadley fair notice of what Thigpen considers the standard of care, how Wadley breached that standard, and how that breach caused Birdwell's injuries. We therefore reverse the judgment and remand the case to the trial court for further proceedings consistent with this opinion.