**Robert B. SIMONSON, M.D., Joan Wilkin, D.O., and Donald Lehman, R.N., F.N.P., Appellants,**

v.

**Lacresha KEPPARD, Lanette Keppard, Individually and As Representative of the Estate of Carol J. Keppard, Deceased, and As Next Friend of Natalie Keppard, and Clara Cuba, Appellees.**

No. 05–06–00842–CV.

Court of Appeals of Texas, Dallas.

June 4, 2007.

David Adair Mcfarland, Valerie A. Mosman and John Sepehri, Thompson, Coe, Cousins & Irons, L.L.P., John A. Scully, Eric W. Hines and Michelle E. Robberson, Cooper & Scully, P.C., Dallas, for Appellant.

Kirsten M. Castaneda, Dallas, and Craig M. Daugherty, Law offices of Craig M. Daugherty, Tyler, for Appellee.

Before Justices WRIGHT, O'NEILL, and LANG.

## OPINION

Opinion by Justice WRIGHT.

Dr. Robert Simonson, Dr. Joan Wilkin, and Nurse Donald Lehman appeal the trial court's order denying their motions to dismiss for the plaintiffs' failure to file an adequate expert report. Nurse Lehman filed a separate brief from Doctors Simonson and Wilkin. In his brief, Nurse Lehman asserts in three points of error that the trial court abused its discretion in denying his motion to dismiss because (1) the expert was not qualified to opine on the conduct of a nurse practitioner; (2) the expert did not set forth the applicable standard of care for a nurse practitioner; and (3) the expert failed to adequately set forth causation. We sustain Nurse Lehman's first point of error, reverse the trial court's order with respect to Nurse Lehman, and dismiss the lawsuit against Nurse Lehman.

In a single point of error, Doctors Simonson and Wilkin contend the trial court abused its discretion in denying their motion to dismiss. We overrule their point of error and affirm the trial court's order as to Doctors Simonson and Wilkin.

### Background

On December 29, 2002, Carol Keppard went to the emergency room at Methodist Hospital. The admitting physician was Dr. Simonson. Keppard was seen by Nurse Lehman who noted her symptoms as a two-week long headache, nausea, and vomiting. Nurse Lehman diagnosed Keppard with a migraine and administered medication accordingly. He released her several hours later after noting slight improvement. Doctor Wilkin signed off on Nurse Lehman's diagnosis. The following day, Keppard was taken by ambulance to Baylor Hospital where she died from a massive intracranial hemorrhage.

The family of Carol Keppard (the Keppards) filed this lawsuit. In compliance with the statutory requirements, they filed an initial expert report. Doctors Simonson and Wilkin and Nurse Lehman filed objections to the report. The trial court

sustained the objections. The Keppards filed an amended expert report. The doctors and Nurse Lehman filed objections to the amended report and sought dismissal of the lawsuit. The trial court denied the motions, and this interlocutory appeal timely followed. *See Cayton v. Moore,* 224 S.W.3d 440, 444 (Tex.App.-Dallas, no pet. h.).

## Expert Report

■■■ We review a trial court's decision on a motion to dismiss a medical malpractice action because of an inadequate expert report for an abuse of discretion. *See American Transitional Care Ctrs. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules and principles. *See Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992) (orig. proceeding).

■■■ When a party files a medical malpractice action, he must file an expert report within 120 days of filing the petition. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (Vernon Supp.2006). The expert report must provide a fair summary of the expert's opinion regarding the applicable standard of care, the manner in which the care rendered failed to meet the standard, and the causal relationship between the failure to meet the standard and the injury. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6) (Vernon Supp.2006). "A report that merely states the expert's conclusions about the standard of care, breach, and causation does not fulfill [the purposes of the Act]." *Palacios,* 46 S.W.3d at 879. A report that omits any of the statutory requirements is not a good faith effort to comply with the Act. *Id.* A trial court must dismiss a cause if it determines that the report does not represent a good faith effort to comply with the statute's require-

ments. *See Jernigan v. Langley,* 111 S.W.3d 153, 156 (Tex.2003).

■■■ The standard of care for a doctor or health care provider is what an ordinarily prudent doctor or health care provider would do under the same or similar circumstances. *Palacios,* 46 S.W.3d at 880. Identifying the standard of care is essential because whether a defendant breached his or her duty to a patient cannot be determined without specific information about what the defendant should have done differently. *Id.*

### 1. Nurse Lehman

■■■ In his first point of error, Nurse Lehman contends the trial court abused its discretion in denying his motion to dismiss appellees' claims on the ground of an inadequate expert report because the expert, Dr. Jeffrey Thomas, failed to show that he was qualified to testify as to the standard of care for a nurse practitioner.

Nurse Lehman gave the following three reasons for objecting to Dr. Thomas's amended expert report: (1) the report failed to outline Dr. Thomas's qualifications to comment on the standard of care applicable to him; (2) the report failed to provide a fair summary of the standard of care applicable to him; and (3) the report failed to describe how any alleged deviation caused the plaintiff's injuries.

To qualify as an expert in a claim against a health care provider, including nurses, the statute provides as follows:

(a) For purposes of this section, "practicing health care" includes:

(1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or

(2) serving as a consulting health care provider and being licensed, certified,

or registered in the same field as the defendant health care provider.

(b) In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

(1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) has knowledge of *accepted standards of care for health care providers for the diagnosis,* care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(a) & (b) (Vernon 2005) (emphasis added).

In his affidavit, Dr. Thomas stated that Nurse Lehman "appears to have been a licensed Nurse Practitioner acting under the supervision of Joan Wilkin, M.D." Dr. Thomas's stated reasons for being familiar with the applicable standard of care are: (1) as a practicing neurosurgeon he has worked in emergency rooms in one capacity or another for his entire career; (2) he has served as an emergency department staff physician during his training; (3) he has served as a consulting physician seeing patients in the emergency room; and (4) as a practicing neurosurgeon, he has frequently assumed the position of an admitting physician as well as an attending physician to patients. Nowhere in his affidavit does Dr. Thomas state that he either has knowledge of the standard of care applicable to nurse practitioners or that he has ever worked with or supervised nurse practitioners.

We disagree with Dr. Thomas's statement that Nurse Lehman "assumed the duties of a physician when he undertook to examine, diagnos[e], and treat Ms. Keppard." Section 74.402(b)(2) makes clear that different standards of care from those applicable to physicians apply with respect to a diagnosis performed by a health care provider. The dissent argues that the expert must have knowledge of the standard of care governing diagnosis and treatment of the plaintiff's condition. We disagree with the dissent's interpretation of the statute. Section 74.402(b)(2) requires that the expert have knowledge of *the accepted standard of care for health care providers, i.e. nurse practitioners, for the diagnosis* involved in the claim. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b)(2) (Vernon 2005).

 Additionally, the Texas Administrative Code sets forth core standards for advanced practice nurses. The term "advanced practice nurse" includes nurse practitioners. *See* 22 TEX. ADMIN.CODE § 221.1(3) (2006). An advanced practice nurse must know and conform to the standards of professional nursing. 22 TEX. ADMIN. CODE § 221.13(a) (2006). Rule 221.13 provides, in part, as follows:

(c) The advanced practice nurse acts independently and/or in collaboration with the health team in the observation, assessment, diagnosis, intervention, evaluation, rehabilitation, care and counsel, and health teachings of persons who are ill, injured or infirm or experiencing changes in normal health processes; and in the promotion and maintenance of health or prevention of illness.

(d) When providing medical aspects of care, advanced practice nurses shall utilize mechanisms which provide authority for that care. These mechanisms may include, but are not limited to, Protocols or other written authorization. This shall not be construed as requiring authority for nursing aspects of care.

(1) Protocols or other written authorization shall promote the exercise of professional judgment by the advanced practice nurse commensurate with his/her education and experience. The degree of detail within protocol/policies/practice guidelines/clinical practice privileges may vary in relation to the complexity of the situations covered by such Protocols, the advanced specialty area of practice, the advanced educational preparation of the individual, and the experience level of the individual advanced nurse practitioner.

(2) Protocols or other written authorization:

(A) should be jointly developed by the advanced practice nurse and the appropriate physician(s),

(B) shall be signed by both the advanced practice nurse and the physician(s),

(C) shall be reviewed and re-signed at least annually,

(D) shall be maintained in the practice setting of the advanced practice nurse, and

(E) shall be made available as necessary to verify authority to provide medical aspects of care.

(e) *The advanced practice nurse shall retain professional accountability for advanced practice nursing care.*

22 Tex. Admin. Code § 221.13 (2006) (emphasis added). An advanced practice nurse is accountable for advanced practice nursing care but not for a doctor's care. The dissent also argues that nurse practitioners may only perform diagnoses under proper delegation by a supervising physician under the Texas Medical Practice Act, which "effectively" incorporates the standard of care governing physicians. As the dissent notes, however, the delegating physician remains responsible for the medical acts delegated. The dissent cites no authority for the proposition that a nurse practitioner performing a medical act delegated by a physician is held to a physician's standard of care. Moreover, the standards for advanced practice nurses provide that they may make diagnoses within the confines of written authorization. *See* 22 Tex. Admin. Code § 221.13(c) & (d) (2006). Even when making a diagnosis, an advanced practice nurse remains accountable for advanced practice nursing care not a physician's care. *See* 22 Tex. Admin. Code § 221.13(e) (2006).[1]

Dr. Thomas did not state that he had any familiarity with the standard of care for a nurse practitioner. Nurse practitioners have advanced education in nursing. Although a nurse practitioner may make a diagnosis, he does so within the protocols or other written authorizations signed by a physician. Without familiarity with the protocols for Nurse Lehman, Dr. Thomas cannot know the standard of care applicable to Nurse Lehman. *See Cox v. Vanguard Health Sys., Inc.*, No. 04–04–00762–CV, 2005 WL 2367582, at *5 (Tex.

---

**1.** We note that the dissent asserts a public policy argument for holding a nurse practitioner to a physician's standard of care while performing medical acts. We disagree. An assertion of this public policy argument disregards the clear reading of the statute holding health care providers accountable for the standard of care commensurate with their education and experience. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.402(b)(2) (Vernon 2005).

App.-San Antonio, Sept. 28, 2005, pet. denied) (mem op.) (holding expert report inadequate because expert gave no indication that he was familiar with practice of nurse in emergency room); *Jones v. Ark–La–Tex Visiting Nurses, Inc.*, 128 S.W.3d 393, 396–97 (Tex.App.-Texarkana 2004, no pet.) (expert report failed to show that physician expert had any familiarity with standard of care for nurses monitoring patient in home healthcare setting).

We conclude the trial court abused its discretion in denying Nurse Lehman's motion to dismiss based on an inadequate expert report. We sustain Nurse Lehman's first point of error. Because of our disposition of Nurse Lehman's first point of error, we do not address his second and third points of error.

### 2. Dr. Simonson and Dr. Wilkin

In their sole point of error, Doctors Simonson and Wilkin contend the trial court erred in denying their motion to dismiss for failure to provide an adequate expert report. Specifically, Doctors Simonson and Wilkin assert that the report is inadequate because Dr. Thomas was not qualified in their field of emergency medicine and his opinion on causation was speculative and conclusory.

### a. Qualifications

As to who qualifies as an expert witness in a suit against a physician, the statute provides:

(a) In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as a expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:

(1) is practicing medicine at the time such testimony is given or was prac-

ticing medicine at the time the claim arose;

(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

(b) For purposes of this section, "practicing medicine" or "medical practice" includes, but is not limited to, training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians.

(c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

(1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and

(2) is actively practicing medicine in rendering medical care services relevant to the claim.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(a)-(c) (Vernon 2005).

Doctors Simonson and Wilkin contend that Dr. Thomas's report is deficient because he is not qualified to state the standard of care for emergency room physicians. Dr. Thomas stated in his report that he has "worked in hospital emergency departments in one capacity or another for my entire career." He has served as an emergency room staff physician and as a consulting physician seeing patients in the emergency room. Dr. Thomas stated that he frequently consults with emergency

room doctors and is familiar with the circumstances that call for consultation.

The cases relied upon by Doctors Simonson and Wilkin are distinguishable. *See Cox,* 2005 WL 2367582 at *5 (not designated for publication) (no indication in expert's report that he had ever practiced emergency medicine); *Shelton v. Sargent,* 144 S.W.3d 113, 125 (Tex.App.-Fort Worth 2004, pet. denied) (no indication expert possessed experience in field of radiology); *In re Windisch,* 138 S.W.3d 507, 511 (Tex.App.-Amarillo 2004, orig. proceeding) (no indication expert radiologist had experience with embolization procedure performed by neuroradiologist); *Tomasi v. Liao,* 63 S.W.3d 62, 66 (Tex. App.-San Antonio 2001, no pet.) (expert psychiatrist provided no information showing he had experience in post-operative care following neurosurgery); *Spivey v. James,* 1 S.W.3d 380, 382–83 (Tex.App.-Texarkana 1999, pet. denied) (dentist filed expert report on behalf of oral surgeon but failed to show training in dental surgery or experience with treating questioned condition).

Dr. Thomas's expert report established that he has experience in both his own field of neurosurgery and Doctors Simonson's and Wilkin's field of emergency medicine. We conclude Dr. Thomas's qualifications as set forth in his report sufficiently qualify him to opine on the standard of care for Doctors Simonson and Wilkin.

### b. Causation

■ Doctors Simonson and Wilkin also contend Dr. Thomas's report is inadequate because his statements as to causation are mere conclusions.

■ A report that merely states the expert's conclusion as to causation does not satisfy the statutory requirements. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6) (Vernon Supp.2006). The expert must explain how the alleged negligence caused the injury or death. *See Bowie Memorial Hosp. v. Wright,* 79 S.W.3d 48, 53 (Tex.2002).

As to causation, Dr. Thomas opined as follows:

The early diagnosis of cerebellar infarction or hemorrhage would have prompted admission to the hospital, probably the intensive care unit, where meticulous medical care (e.g., blood pressure medication, factor VIIs) might have prevented neurological deterioration. Even if such deterioration had occurred, it would have done so under watchful medical care, thus enabling rapid lifesaving intervention, such as craniotomy or ventriculostomy. Thus, the negligent failure of Drs. Simonson and Wilkin along with Mr. Lehman to submit this symptomatic patient to CT scan or arrange for a neurological consultation was a proximate cause of her ultimate death in that had these things been done in reasonable medical probability she would have survived.

Doctors Simonson and Wilkin contend that Dr. Thomas's opinion on causation contains gaps that prevent it from being a "fair summary." They contend that Dr. Thomas fails to explain how failing to order a CT scan or neurological consultation was the proximate cause of death. We disagree. Dr. Thomas opined that in reasonable medical probability, the deceased would have survived had she obtained an early diagnosis. The alleged failure of the defendants to order a CT scan or neurological consultation prevented the early diagnosis that in reasonable medical probability would have saved her life. *See Estate of Birdwell v. Texarkana Memorial Hosp., Inc.,* 122 S.W.3d 473, 480 (Tex. App.-Texarkana 2003, pet. denied) (report sufficient that stated had patient been

properly restrained, patient's fall could have been prevented); *Russ v. Titus Hosp. Dist.*, 128 S.W.3d 332, 342 (Tex. App.-Texarkana 2004, pet. denied) (report sufficient that stated that one of two interventions would have prevented patient's injuries); *Bustillos v. Rowley*, No. 08–04–00331–CV, 2005 WL 2095291, at *7, 225 S.W.3d 122, 130–31 (Tex.App.-El Paso Aug. 31, 2005, pet. denied) (report sufficient that stated if patient had been properly monitored, her heart condition would have been detected and treated and subsequent cardiac arrest prevented).

Doctors Simonson and Wilkin rely on *Bowie* to support their contention that Dr. Thomas's report is conclusory as to causation. *See Bowie*, 79 S.W.3d at 48. In *Bowie*, the plaintiff went to the hospital following a car accident. Hospital personnel x-rayed her foot and knee. The x-ray of her foot was either misplaced or misread. As a result, her foot fracture was not discovered until almost one month later. *Id.* at 50. The expert in *Bowie* opined that "if the x-rays would have been correctly read and the appropriate medical personnel acted upon those findings then [the plaintiff] would have had the possibility of a better outcome." *Id.* at 51. The trial court dismissed the case for an inadequate expert report. The court of appeals reversed. In reversing the court of appeals, the supreme court stated that it "could not infer, as the [plaintiff] asks us to, that Bowie's alleged breach precluded [the plaintiff] from obtaining a quicker diagnosis and treatment for her foot." *Id.* at 53. The court held that the report did not constitute a fair summary within the meaning of the statute because it failed to provide information connecting the expert's conclusion that the plaintiff might have had a better outcome with the alleged breach of failing to correctly read the x-ray. *Id.*

Dr. Thomas's report does not suffer from the same inadequacies as the report in *Bowie*. Dr. Thomas stated that, if a CT scan had been performed or neurological consultation had occurred, the deceased would have been diagnosed with cerebellar infarction or hemorrhage. With the proper diagnosis, the deceased would have been admitted and either neurological deterioration prevented or rapid lifesaving measures taken in the face of neurological deterioration. Dr. Thomas connected his conclusion as to causation with the alleged breaches of Doctors Simonson and Wilkin.

Dr. Thomas's report likewise does not compare to those in other cases relied upon by Doctors Simonson and Wilkin. In one case, an expert opined that performing surgery without a proper medical pre-operative evaluation resulted in the patient's death. *See Nelson v. Ryburn*, 223 S.W.3d 453, 457 (Tex.App.-Amarillo Apr.18, 2006, no pet.). The report lacked any explanation as to why the failure to perform the pre-operative evaluation caused the patient's death. In *Hutchinson v. Montemayor*, 144 S.W.3d 614 (Tex.App.-San Antonio 2004, no pet.), the expert opined that if an arteriogram had been performed, by-passable lesions may have been discovered and the leg amputation may have been avoided. *Id.* at 617. The report did not state that an arteriogram would have led to the discovery of by-passable lesions or that such discovery would have prevented amputation. In contrast, Dr. Thomas explained in his report that an early diagnosis would have either prevented neurological deterioration or at least Keppard would have been admitted into the hospital where lifesaving measures could have been taken to save her life.

We conclude the trial court did not abuse its discretion in denying the motion to dismiss of Doctors Simonson and Wilkin. We overrule their point of error and

affirm the trial court's order as to Doctors Simonson and Wilkin. We reverse the trial court's order as to Nurse Lehman and render judgment dismissing the lawsuit as to Nurse Lehman.

O'NEILL, J., dissenting.

Dissenting Opinion by Justice O'NEILL.

The majority holds the trial court abused its discretion by failing to dismiss the Keppards' medical negligence suit against Advanced Nurse Practitioner (ANP) Lehman under Texas Civil Practice and Remedies Code sections 74.351 and 74.402. It reasons that the pre-trial report of the Keppards' neurologist expert, Dr. Thomas (i) did not establish he was qualified to testify on the standard of care governing nurse practitioners and (ii) did not show familiarity with the protocols or written authorizations they must use when providing the type of care given here, medical diagnosis and treatment of the condition that the Keppards allege caused Carol Keppard's death.

I do not believe this states the correct inquiry. I first note that under section 74.402(b), expert qualification does not turn on the credentialing of the defendant caregiver but on the expert's competence with the *type of care delivered* to the patient and the expert's knowledge of the standard governing diagnosis and treatment *of the patient's condition.* Dr. Thomas's report shows he is qualified to perform the type of medical services the record shows ANP Lehman delivered that the Keppards allege proximately caused Carol Keppard's death and qualified to opine on the standard governing performance of those services. But what I find

dispositive is that ANPs can perform medical diagnoses and treatment only under proper delegation by a supervising physician under the Texas Medical Practice Act and that statute effectively incorporates the standard of care governing physicians.

Second, the Keppards have not sued Lehman for improper delegation or breach of a protocol. But even if they had, they still make a separate claim of simple medical negligence breaching the standard of care of a physician, a matter about which Dr. Thomas is indisputably qualified to opine. Moreover, ANP protocols do not detail the exact steps ANPs must take in performing delegated medical care, so they do not set a standard of care at all. Though I recognize there are many situations where the standard of care governing an ANP and physician differ, my review of the applicable statutory and regulatory framework and the circumstances of this case lead me to conclude that any difference is not relevant here. I therefore respectfully dissent.

FACTUAL AND PROCEDURAL BACKGROUND

Dr. Thomas's report states Carol Keppard presented to a hospital emergency room complaining of severe longstanding headache, vomiting, and nausea and that Drs. Simonson and Wilkin were the admitting and supervisory physicians, respectively. ANP Lehman's resume states he is a credentialed "nurse practitioner" and licensed "advanced practice nurse" or ANP,[1] working in the emergency department of a physician emergency care association.

The record shows ANP Lehman examined Ms. Keppard, diagnosed a migraine, prescribed medications, monitored her, and discharged her hours later when she

---

1. "Advanced practice nurse" is "synonymous with 'advanced nurse practitioner.'" TEX. OCC.CODE ANN. § 301.152(a) (Vernon 2004).

improved. It appears no physician examined her. Dr. Wilkin signed the hospital record documenting Lehman's diagnosis, treatment, and discharge instructions. The Keppards allege Ms. Keppard died from an intracranial brain hemorrhage the next day.

Dr. Thomas's report opines that the standard of care in responding to Ms. Keppard's symptoms was to order a CT scan and to consult a neurologist to diagnose the probability of increased intracranial pressure. He opined that an earlier diagnosis would have prompted hospital admission and proper medical care and that ANP Lehman's failure to order a CT scan or neurological consultation proximately caused Ms. Keppard's death with reasonable medical probability. He also opined that because ANP Lehman "assumed the duties of a physician" in examining, diagnosing, and treating Ms. Keppard, Lehman is held to the same standard of care.

Dr. Thomas' report states he is a practicing neurosurgeon who has worked in hospital emergency departments in different capacities his entire career, has frequently served as admitting and attending physician as a neurosurgeon, has served as an emergency department staff physician during his training, and has served as an emergency department consulting physician. He states he is familiar with the standard of care applicable to all defendants and with the definitions of negligence, ordinary care, and proximate cause.

The Keppards sued ANP Lehman and Drs. Simonson and Wilkin for:

- negligent misdiagnosis and treatment breaching the standard of care applicable to "physicians and nurse practitioners in the same or similar circumstances"; and

- negligent instruction of hospital personnel in proper care and treatment of patients like Ms. Keppard.[2]

The majority holds Dr. Thomas's report is sufficient to satisfy the statutory expert report requirements for the physician defendants and I agree. But I also believe it is sufficient for ANP Lehman under the governing statutory and regulatory framework applied to the circumstances here.

## Law Governing Medical Expert Competence

Texas Civil Practice and Remedies Code section 74.402[3] governs expert witness

2. The Keppards' original petition asserted two types of claims, negligent medical treatment of Ms. Keppard and negligence in developing and executing hospital protocols or policies and procedures for care of patients like Ms. Keppard. Against the hospital, "by and through" its agents and employees, the Keppards alleged negligence in:
- failing to develop, employ, monitor, and follow appropriate policies and procedures for assessing, treating, managing, and overseeing patients like Ms. Keppard; and
- failing to train and employ appropriate personnel to execute hospital policies and procedures.
The Keppards non-suited the hospital before the trial court ruled Dr. Thomas's report sufficient; thus, the only claims against ANP Lehman and the physicians here are (i) negligent misdiagnosis/treatment of Ms. Keppard and

(ii) negligent instruction of hospital personnel.

3. Tex. Civ. Prac. & Rem.Code Ann. § 74.402(a)-(c) (Vernon 2005) states:
 § 74.402. Qualifications of Expert Witness in Suit Against Health Care Provider
 (a) For purposes of this section, "practicing health care" includes:
 (1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or
 (2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider.
 (b) In a suit involving a health care liability claim against a health care provider, a per-

qualification in medical negligence suits against "health care providers," defined to include registered nurses. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.001(a)(12)(A)(i) (Vernon 2005).[4] An ANP must be a registered nurse. Tex. Occ.Code Ann. § 301.152(a) (Vernon 2004). An expert may not opine on breach of the standard of care in these suits unless the expert meets each of three requirements:

(1) **Type of practice:** "practicing health care in a field of practice that involves the *same type of care or treatment as that delivered* by the defendant" (if an individual);

(2) **Type of knowledge:** knowledge of the standard of care "for health care providers for the diagnosis, care, or *treatment of the illness, injury, or condition involved in the claim*"; and

(3) **Type of training or experience:** training or experience to opine on that standard.[5]

*See* § 74.402(b)(1)-(3) (emphasis added).

Statutes must be construed as written, and legislative intent determined, if possible, from their express terms. *Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 493 (Tex.2001). The statute in its entirety (here, Civil Practice and Remedies Code, chapter 74, governing medical liability), rather than provisions in isolation, must be considered, and meaning given to each provision consistent with all others. *Id.* Courts presume the entire statute is to be effective and a just and reasonable result is intended. *Id.* (citing Tex. Gov't Code § 311.021(2), (3)). Even if unambiguous, courts may consider the statute's objective, circumstances of enactment, legislative history, common law, former statutes, laws on the same or similar subjects, consequences

son may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person: (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose; (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care. (c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness: (1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and (2) is actively practicing health care in rendering health care services relevant to the claim.

4. Tex. Civ. Prac. & Rem.Code Ann. § 74.001(a)(12)(A)(i) (Vernon 2005) states: " 'Health care provider' means any person, partnership, professional association, corporation, facility, or institution duly licensed, certified, registered, or chartered by the State of Texas to provide health care, including: (i) a registered nurse;...." "Health care" is "any act or treatment ... by any health care provider ... during the patient's medical care, treatment, or confinement." Tex. Civ. Prac. & Rem.Code Ann. § 74.001(a)(10) (Vernon 2005).

5. To determine qualification by "training or experience" under subsection (b)(3), the court "shall consider" (1) certification or other substantial training or experience "in the area of health care relevant to the claim" and (2) active practice of "health care in rendering health care services relevant to the claim." *See* § 74.402(c)(1)-(2).

of a particular construction, administrative construction, and title, preamble, and emergency provision. *Id.* (citing TEX. GOV'T CODE § 311.023). All words used and omitted are presumed used and omitted purposefully. *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 540 (Tex. 1981).

Chapter 74 legislates separate qualification criteria for two types of experts in two types of suits. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.351(r)(5) (separately defining "expert" qualified to opine on breach of standard governing physicians and standard governing health care providers), 74.401 (expert qualifications in suits against physicians), 74.402 (expert qualifications in suits against health care providers) (Vernon 2005 & Supp.2006). Sections 74.401 and 74.402 thus apply to suits against physicians and "health care providers," respectively, and set the criteria for experts qualifying to testify on the standard of care governing physicians and "health care providers," respectively.

In suits against physicians, section 74.401(a) provides that an expert may not opine on breach of the governing standard of care unless the expert "is a physician" who (1) is "practicing medicine"; (2) has knowledge of the standards of "medical care" governing diagnosis or treatment of

the plaintiff's condition; and (3) has training or experience in the standards of "medical care." A "physician" includes one "licensed to practice medicine...." *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 74.001(a)(23)(A), 74.401(g)(1)-(2) (definition if not testifying as a defendant) (Vernon 2005); TEX. OCC.CODE ANN. § 151.002(a)(12) (Vernon Supp.2006).[6] "Medical care" is defined as "any act" of "practicing medicine" under section 151.002 of the Texas Occupations Code (definitional section of Texas Medical Practice Act[7]) by a physician. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(a)(19) (Vernon 2005).[8] "Practicing medicine" includes diagnosis or treatment of a physical disease or disorder by one professing to be a physician and compensated for those services. *See* TEX. OCC.CODE ANN. § 151.002(a)(13) (Vernon Supp.2006).[9]

By contrast, section 74.402(b) (applicable since an ANP is a "health care provider" and Lehman is not a physician) more broadly applies to experts "practicing health care" who opine on breach of the standard of care in suits against a "health care provider." Under section 74.402(b)(1), a person can qualify as an expert witness "only if the person ... is practicing health care...."

6. "Physician" also includes a physician partnership or limited liability partnership, physician professional association or limited liability company formed under Texas law, and Texas certified non-profit health corporation. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(a)(23)(B)-(E) (Vernon 2005).

7. TEX. OCC.CODE ANN tit. 3 ("Health Professions"), subtit. B ("Physicians"), chs. 151–165 (Vernon 2004 & Supp.2006).

8. TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(a)(19) (Vernon 2005) states: " 'Medical care' means any act defined as practicing medicine under Section 151.002, Occupations Code, performed or furnished, or which

should have been performed, by one licensed to practice medicine in this state for, to, or on behalf of a patient during the patient's care, treatment, or confinement."

9. TEX. OCC.CODE ANN. § 151.002(a)(13) (Vernon Supp.2006) states: " 'Practicing medicine' means the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions, by a person who: (A) publicly professes to be a physician or surgeon; or (B) directly or indirectly charges money or other compensation for those services."

Thus, the threshold question in applying section 74.402(b) is whether Dr. Thomas is "practicing health care." The definitions are not explicit.[10] But any sensible understanding of "health care" [11] and its statutory definition as "any act or treatment ... during the patient's *medical* care, treatment, or confinement," *see* § 74.001(a)(10) (emphasis added),[12] along with other provisions of chapter 74,[13] compel a conclusion that a physician practicing medicine is also practicing "health care" and thus can qualify as an expert under section 74.402(b).

The majority holds Dr. Thomas unqualified, stating he did not demonstrate any familiarity with the "standard of care of a nurse practitioner." But section 74.402(b)(1)-(2) makes the inquiry turn not on the credentialing or speciality of the defendant caregiver but on (1) the nature of the expert's health care practice and whether it "involves the same type of care or treatment as that delivered by the defendant" and (2) the expert's knowledge of the standard of care governing the defendant for the diagnosis and treatment of the "condition involved in the claim...." [14] Dr. Thomas states the standard for responding to Ms. Keppard's *condition*, and opines that failing to respond as he stated proximately caused her death. He opines ANP Lehman "assumed the duties of a physician" in treating Ms. Keppard and is held to the same standard of care.

Chapter 74 nowhere categorically bars physicians from opining on the standard governing ANPs or other non-physician "health care providers." The legislature knew how to express such a limitation were that its intent.[15] And in enacting

**10.** First, the statute circuitously defines "health care" as "any act or treatment ... *by any health care provider* ... during the patient's medical care, treatment, or confinement" and "health care provider" as persons or entities credentialed "to provide *health care* ...." TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(a)(10), (12)(A) (Vernon 2005) (emphasis added). Second, physicians are not included among the examples the "health care provider" definition lists. TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(a)(12)(A)(i)-(vii) (Vernon 2005) (examples are nurses, dentists, podiatrists, pharmacists, chiropractors, optometrists, and health care institutions). The latter, however, is not dispositive; the statute's predecessor's list was exclusive, but the current definition's use of "including" makes it non-exclusive. *Pro Path Servs., L.L.P. v. Koch*, 192 S.W.3d 667, 670–71 (Tex.App.-Dallas 2006, pet. denied) (citing TEX. GOV'T CODE § 311.005(13)).

**11.** *See* TABER'S CYCLOPEDIC MEDICAL DICTIONARY 937 (F.A.Davis, 20th ed.2005) ("health care" is "[a]ll of the services made available by medical professionals to promote, maintain, or preserve life and well-being.").

**12.** *Cf. MacPete v. Bolomey* 185 S.W.3d 580, 584–85 (Tex.App.-Dallas 2006, no pet.) (services that are an "inseparable part" of "treatment" of a "medical condition" fall within chapter 74's definition of "health care" under section 74.001(a)(10)).

**13.** *See, e.g.,* §§ 74.001(a)(13) (emphasis added) (broadly defining *"Health care* liability claim" to include one against a "health care provider *or physician"* for breaching standards of *"medical care,* or health care"); 74.001(a)(12)(B)(i)-(ii) (emphasis added) (*"health care* provider" explicitly *defined to* include various agents and related persons or entities "of a health care provider *or physician* "); 74.451(a), (c) (emphasis added) (governing arbitration agreements) (employing phrases like *"physician* ... *or other health care provider"* and *"health care provider other than a physician* ").

**14.** *See also* § 74.402(c) (emphasis added) (to determine qualification by "training or experience" under section 74.402(b)(3), the court "shall consider" (1) certification, training, or experience in the area of health care *"relevant to the claim"* and (2) active practice of health care services *"relevant to the claim."*).

**15.** *Cf.* TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(a) (Vernon 2005) (emphasis added) (expert can opine on breach of standard of care governing physicians *"only if the person is a physician"* who satisfies section

section 74.402(b)(1), the legislature rejected the House version requiring an expert to practice "in the same field of practice as the defendant" and instead adopted the broader Senate version requiring an expert to practice "in a field of practice that involves the same type of care or treatment as that delivered by the defendant...." *See Group v. Vicento*, 164 S.W.3d 724, 731 n. 5 (Tex.App.-Houston [14th Dist.] 2005, pet. filed) (citing CONFERENCE COMM. REPORT, Tex. H.B. 4, 78th Leg., R.S. (2003)).[16]

In suits against physicians under section 74.401(a)(2)'s predecessor, with terms essentially identical to section 74.402(b)(2), courts have held physician-experts need not be credentialed in the same specialty as the defendant if the expert has sufficient training, practical experience, or knowledge of the standard of medical care "for *the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim* ...."[17] There is also case law generally holding non-nurse physicians can opine on the standard of nursing care under section 74.402(b)—and specifically where the physician has expertise in treating the plaintiff's condition that the nurses execute.[18] Outside of pre-trial expert re-

74.401(a)) *with* TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b) (Vernon 2005) (emphasis added) (expert can opine on breach of standard of care governing a "health care provider" "only if *the person* " satisfies section 74.402(b)); *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 74.403(a) (Vernon 2005) (expert can opine on medical causation "only if the person is a physician").

16. In light of section 74.402(b)(1)'s express terms and legislative history, I do not find persuasive Nurse Lehman's argument that section 74.402(a) limits the scope of qualifying experts under section 74.402(b) to health care providers practicing "in the same field" as the defendant. Section 74.402(a) does state that "practicing health care" for purposes of section 74.402 "includes" training (at accredited institutions) and consulting services if (1) the health care providers that the expert trains are *"in the same field* as the defendant" and (2) the expert serving as a consulting health care provider is credentialed *"in the same field* as the defendant...." *See* § 74.402(a)(1)-(2) (emphasis added). However, "includes" is a term of "enlargement and not of limitation or exclusive enumeration" and its use does "not create a presumption that components not expressed are excluded." TEX. GOV'T CODE § 311.005(13); *see Group v. Vicento*, 164 S.W.3d at 731 (holding section 74.402(a)'s "practicing health care" definition is nonexclusive and does not prohibit an anesthesiologist from testifying on the standard of care for a chiropractor). Adopting Nurse Lehman's argument would literally mean practitioners who do not train or consult may not

testify, an absurd result that ignores section 74.402(b)(1)'s express terms.

17. *See Blan v. Ali*, 7 S.W.3d 741, 745–46 (Tex.App.-Houston [14th Dist.] 1999, no pet.) (reviewing authorities, emphasis original). *Blan* held a neurologist qualified to opine on the standard governing a cardiologist and emergency room physician's treatment of a stroke, though he admitted unfamiliarity with the standard governing those professions. *Id.* at 746. *Blan* stated the statute focuses not on the defendant's expertise but on the plaintiff's condition, and reasoned that the neurologist was qualified to treat strokes and stated the standard governing *"any* physician" treating one. *Id.* at 746–47 (emphasis original).

18. *See Manor Care Health Servs., Inc. v. Ragan*, 187 S.W.3d 556, 562–63 (Tex.App.-Houston [14th Dist.] 2006, pet. granted, judgm't vacated and remanded by agr.) (physician without demonstrated nursing experience, but qualified to opine on "type of care at issue," is competent to opine on nurses' breach of standard of care in failing to administer doctor-prescribed medications indicated for the patient's condition; "a physician is not disqualified from offering an opinion regarding nursing care simply because he is a physician and not a nurse"). The same result obtained in a suit against a physician's assistant who under a cardiologist's supervision [*see* TEX. OCC.CODE §§ 204.202, .204] treated a patient for a condition a cardiologist expert was qualified to treat. The result obtained though the expert report did "not separately set forth a

port requirements, there is authority generally holding physicians qualified under the rules of evidence to testify on nursing care in medical malpractice suits.[19]

On the other hand, the majority cites two cases holding physician experts unqualified where they do not establish familiarity with care specific to nursing; e.g., in an emergency room or home health care setting. Those cases were decided under section 74.402(b)'s predecessor, which defined "expert" opining about non-physician health care providers as having "knowledge of accepted standards of care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim."[20] Current section 74.402(b)(1) added language requiring experts opining about "health care providers" to be practicing health care in a "field of practice that involves the same type" of care. This may explain a different emphasis by these courts on a specific category of caregiver. *See Jones v. Ark–La–Tex Visiting Nurses,*

*Inc.,* 128 S.W.3d 393, 397 (Tex.App.-Texarkana 2004, no pet.) (report failed to state standard for "this particular type of provider"); *Cox v. Vanguard Health Sys., Inc.,* 2005 WL 2367582, *3 (Tex.App.-San Antonio 2005, pet. denied) (mem.op.) (standard stated "not specific to emergency room physicians and staff").

I do not find it necessary, however, to reach the issue of whether a physician is generally qualified to opine on the standard of care governing ANPs as I believe a physician's standard of care is imposed on ANP Lehman under the statutory and regulatory framework applicable to the facts.

## LAW GOVERNING ANPS AND AUTHORITY TO PERFORM MEDICAL ASPECTS OF CARE

### ANPs and ANP standard of care

The Texas Nursing Practice Act[21] regulates nursing and defines an ANP as a

standard of care applicable to [the assistant]," but stated the same physician-standard applied and showed experience in supervising nurses and physician's assistants treating the same condition. *In re Stacy K. Boone, P.A.,* 223 S.W.3d 398, 401, 404-406 (Tex.App.-Amarillo 2006, orig. proceeding) (citing *Manor Care* and applying chapter 74's predecessor, TEX.REV.CIV. STAT. art. 4590i).

**19.** *See Hall v. Huff,* 957 S.W.2d 90, 94, 100 (Tex.App.-Texarkana 1997, pet. denied) (reviewing authorities, emphasis original) ("just because [the expert] is a physician does not necessarily render him unqualified as an expert on nursing standards of care," noting "jurisdictions, including Texas, ... have found physicians to be qualified"; *held,* trial court abused discretion ruling physician expert unqualified under Rule 702 to opine on nursing standard of care to diagnose and treat condition in time to prevent death, where expert showed familiarity with standard for diagnosing and treating same condition *"under same or similar circumstances"* and familiarity with national nursing standards though not specific to Texas) (citing

*Webb v. Jorns,* 488 S.W.2d 407, 411 (Tex. 1972) (physician anesthesiologist with nurse teaching experience and knowledge of minimum standards for both physician anesthesiologists and nurse anesthetists could testify on nurse anesthetist standard of care)).

**20.** *See* former TEX.REV.CIV. STAT. art. 4590i, § 13.01(r)(5)(B) (" 'Expert' means ... with respect to a person giving opinion testimony about a nonphysician health care provider, an expert who has knowledge of accepted standards of care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim."). Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985, 987, *repealed and recodified as amended by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 10.01, 10.09, 23.02(a), (d), 2003 Tex. Gen. Laws 847, 864, 884, 898–99 ("House Bill 4") (adopting Texas Civil Practice and Remedies Code, chapter 74, applicable only to actions filed on or after September 1, 2003).

**21.** TEX. OCC.CODE ANN. tit. 3 ("Health Professions"), subtit. E ("Regulation of Nursing"),

registered nurse who is approved by the Texas Board of Nurse Examiners to practice as an "advanced practice nurse" after completing an advanced educational program. Tex. Occ.Code Ann. § 301.152(a) (Vernon 2004); 22 Tex. Admin. Code § 221.1(3) (2007).[22] The Texas Medical Practice Act regulating physicians adopts this definition. See Tex. Occ.Code Ann. § 157.051(1) (Vernon Supp.2006). Standards governing ANPs are found at title 22, part 11 of the Texas Administrative Code; see generally 22 Tex. Admin. Code ch. 221 (2007).

ANPs are registered nurses, Tex. Occ. Code Ann. § 301.152(a) (Vernon 2004), with an expanded authorized practice scope or speciality. See 22 Tex. Admin. Code §§ 221.1(3), 221.12(2) (2007).[23] An

ANP "acts independently and/or in collaboration with other health care professionals in the delivery of health care services." 22 Tex. Admin. Code § 221.1(3) (2007). That independent or collaborative practice ostensibly extends to "diagnosis" and "care" of virtually any health condition. See 22 Tex. Admin. Code § 221.13(c) (2007) (emphasis added):

> The advanced practice nurse acts independently and/or in collaboration with the health team in the *observation, assessment, diagnosis, intervention, evaluation, rehabilitation, care* and counsel, and health teachings of persons who are *ill, injured or infirm or experiencing changes in normal health* processes; and in the promotion and maintenance of health or prevention of illness.[24]

---

ch. 301 ("Nurses"), §§ 301.00 -.607 (Vernon 2004 & Supp.2006).

**22.** Tex. Occ.Code § 301.152. Rules Regarding Specialized Training

(a) In this section, "advanced practice nurse" means a registered nurse approved by the board to practice as an advanced practice nurse on the basis of completion of an advanced educational program. The term includes a nurse practitioner, nurse midwife, nurse anesthetist, and clinical nurse specialist. The term is synonymous with "advanced nurse practitioner."
Tex. Admin. Code § 221.1. Definitions
. . . .
(3) Advanced practice nurse-A registered nurse approved by the board to practice as an advanced practice nurse based on completing an advanced educational program acceptable to the board. The term includes a nurse practitioner, nurse-midwife, nurse anesthetist, and a clinical nurse specialist.

**23.** § 221.1. Definitions
. . . .
(3). . . . The advanced practice nurse is prepared to practice in an expanded role to provide health care to individuals, families, and/or groups in a variety of settings including but not limited to homes, hospitals, institutions, offices, industry, schools, community agencies, public and private clinics, and private practice. The advanced practice

nurse acts independently and/or in collaboration with other health care professionals in the delivery of health care services.
. . . .
§ 221.12. Scope of Practice
The advanced practice nurse provides a broad range of health services. . . . Advanced practice nurses practice in a variety of settings and, according to their practice specialty and role, they provide a broad range of health care services to a variety of patient populations.
. . . .
(2) The advanced practice nurse's scope of practice shall be in addition to the scope of practice permitted a registered nurse and does not prohibit the advanced practice nurse from practicing in those areas deemed to be within the scope of practice of a registered nurse.

**24.** The Nursing Practice Act uses nearly identical language in defining "professional nursing," but omits the term "diagnosis." See Tex. Occ.Code Ann. § 301.002(2)(A)-(B) (Vernon Supp.2006). Both the Medical Practice Act and the Nursing Practice Act generally bar nurses from making medical diagnoses. See discussion *infra*. To the extent of any conflict, I believe the Occupations Code should control. See Cont'l Cas. Co. v. Downs, 81 S.W.3d 803, 807 (Tex.2002) ("Construction of a statute by the agency charged with its

However, an ANP is not licensed as a "physician" and thus cannot "practice medicine." *See* TEX. OCC.CODE ANN. § 155.001 (Vernon 2004) ("A person may not practice medicine in this state unless the person holds a license issued under this subtitle [Medical Practice Act]."). A "physician" includes one "licensed to practice medicine" [25] and the Medical Practice Act defines "practicing medicine" to include "diagnosis" and "treatment" of physical conditions. *See* TEX. OCC.CODE ANN. § 151.002(a)(13) (Vernon Supp.2006) (emphasis added):

> "Practicing medicine" means the *diagnosis, treatment,* or offer to treat a mental or physical *disease or disorder* or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions, by a person who: (A) publicly professes to be *a physician* or surgeon; or (B) directly or indirectly charges money or other compensation for those services.

The Nursing Practice Act defines "nursing" as "professional or vocational nursing" and states it "does *not include acts of medical diagnosis* or the prescription of therapeutic or corrective measures." TEX. OCC.CODE ANN. § 301.002(2), (4)-(5) (Vernon Supp.2006) (emphasis added). However, "professional nursing" *does* include "medication or treatment *as ordered by a physician,*" or "performance of an act *delegated by a physician*" under chapter 157 of the Medical Practice Act, discussed *infra. Id.* § 301.002(2)(C), (G) (emphasis added).

What ANPs are authorized to do is to deliver health care services within the bounds of their education, training, and practice experience; within the accepted scope of their advanced practice specialty; in conformance with applicable "standards of professional nursing"; and in compliance with the Nursing Practice Act and all applicable laws, rules, and regulations. *See* 22 TEX. ADMIN. CODE §§ 221.12, 221.12(1), 221.13(a)-(b) (2007).[26]

enforcement is entitled to serious consideration only *if that construction is reasonable and does not contradict the statute's plain language."*).

**25.** *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 74.001(a)(23)(A), 74.401(g)(1)-(2) (definition if not testifying as a defendant) (Vernon 2005); TEX. OCC.CODE ANN. § 151.002(a)(12) (Vernon Supp.2006).

**26.** § 221.12. Scope of Practice

The advanced practice nurse provides a broad range of health services, the scope of which shall be based upon educational *preparation, continued advanced practice* experience and the accepted scope of professional practice of the particular specialty area. Advanced practice nurses practice in a variety of settings and, according to their practice specialty and role, they provide a broad range of health care services to a variety of patient populations.
(1) The scope of practice of particular specialty areas shall be defined by national

professional specialty organizations or advanced practice nursing organizations recognized by the Board [of Nurse Examiners]. The advanced practice nurse may perform only those functions which are within that scope of practice and which are consistent with the Nursing Practice Act, Board rules, and other laws and regulations of the State of Texas.
. . . .
§ 221.13. Core Standards for Advanced Practice
(a) The advanced practice nurse shall know and conform to the Texas Nursing Practice Act; current board rules, regulations, and standards of professional nursing; and all federal, state, and local laws, rules, and regulations affecting the advanced role and specialty area. When collaborating with other health care providers, the advanced practice nurse shall be accountable for knowledge of the statutes and rules relating to advanced practice nursing and function within the boundaries of the appropriate advanced practice category.
. . . .

### Delegation of "medical acts" by physicians to ANPs

The Texas Medical Practice Act,[27] which regulates physicians, authorizes them in chapter 157[28] to delegate "any medical act" to be performed by qualified persons, if each of the conditions specified at section 157.001(a)(1)-(2) of the Texas Occupations Code are met. Consistent with regulations recognizing ANPs' "collaboration with other health care professionals in the delivery of health care services" as noted above,[29] the Act contemplates delegation to ANPs. *See* chapter 157, subchapter B, "Delegation to Advanced Practice Nurses and Physician Assistants," TEX. OCC.CODE ANN. §§ 157.051–.060 (Vernon 2004 & Supp.2006). But the Act does "not apply" to nurses "engaged strictly in the practice of nursing" in accordance with their license or other laws, TEX. OCC.CODE ANN. § 151.052(a)(4) (Vernon 2004),[30] so arguably a physician may not delegate a "medical act" to an ordinary nurse (absent Texas Board of Medical Examiner rules authorizing it, *see* TEX. OCC.CODE § 301.154(a)).

The Act imposes these conditions for an authorized delegation:

1. The delegate must be "qualified and properly trained";

2. The delegate must be "acting under the physician's supervision";

3. The act must be one that a "reasonable and prudent physician would find within the scope of sound medical judgment to delegate";

4. The act "in the opinion of the delegating physician" must be one that

 (a) "can be properly and safely performed" by the delegate;

 (b) "is performed in its customary manner";

 (c) "is not in violation of any other statute"; and

5. The delegate "does not represent to the public that the person is authorized to practice medicine."

*See* TEX. OCC.CODE ANN. § 157.001(a)(1)-(2) (Vernon 2004) ("General Authority of Physician to Delegate").[31]

---

(b) The advanced practice nurse shall practice within the advanced specialty and role appropriate to his/her advanced educational preparation.

**27.** TEX. OCC.CODE ANN. tit. 3 ("Health Professions"), subtit. B ("Physicians"), chs. 151–165 (Vernon 2004 & Supp.2006).

**28.** TEX. OCC.CODE ANN. tit. 3 ("Health Professions"), subtit. B ("Physicians"), ch. 157 ("Authority of Physician to Delegate Certain Medical Acts"), §§ 157.001–.101 (Vernon 2004 & Supp.2006).

**29.** *See* 22 TEX. ADMIN. CODE §§ 221.1(3), 221.13(c) (2007).

**30.** § 151.052. Exemptions
 (a) This subtitle [Medical Practice Act] does not apply to:
 . . . .
 (4) a registered nurse or licensed vocational nurse engaged strictly in the practice of

nursing in accordance with the applicable licensing acts and other laws of this state; . . . .

**31.** § 157.001. General Authority of Physician to Delegate
 (a) A physician may delegate to a qualified and properly trained person acting under the physician's supervision any medical act that a reasonable and prudent physician would find within the scope of sound medical judgment to delegate if, in the opinion of the delegating physician:
 (1) the act:
 (A) can be properly and safely performed by the person to whom the medical act is delegated;
 (B) is performed in its customary manner; and
 (C) is not in violation of any other statute; and
 (2) the person to whom the delegation is made does not represent to the public that the person is authorized to practice medicine.

Authorized delegates are "not considered to be practicing medicine without a license...." TEX. OCC.CODE ANN. § 157.005 (Vernon 2004). The exception is if the delegate knows the delegation and action taken under it violate the Medical Practice Act. *Id.* Acts delegated "must comply with other applicable laws." *Id.* § 157.007. ANPs when "collaborating with other health care providers" have a duty not to exceed the scope of their advanced practice speciality and they retain liability for "advanced practice nursing care" and violations of laws governing it. *See* 22 TEX. ADMIN. CODE § 221.13(a), (e) (2007) (emphasis added):

> § 221.13. Core Standards for Advanced Practice
>
> (a).... *When collaborating with other health care providers,* the advanced practice nurse shall be accountable for knowledge of the statutes and rules relating to advanced practice nursing and *function within the boundaries of the appropriate advanced practice category.*
>
> ....
>
> (e) The advanced practice nurse shall retain professional accountability for advanced practice nursing care.

The Texas Medical Board may determine, consistent with chapter 157 governing delegation, whether "an act constitutes the practice of medicine" and is empowered to determine whether a medical act may be "properly or safely delegated by physicians." TEX. OCC.CODE ANN. § 157.001(c)(1)-(2) (Vernon 2004). That authority is limited by section 157.006, which generally leaves to a physician's "professional judgment" to decide "which medical acts may be safely delegated" by barring Board rulemaking containing "global prohibitions or restrictions" unless "absolutely necessary...." *Id.* § 157.006.[32] Though physicians may delegate under chapter 157, they "remain responsible for the medical acts" delegated. *Id.* § 157.001(b).

### ANP protocols

In providing "medical aspects of care" (defined to exempt "nursing aspects"), ANPs are required to use "mechanisms which provide authority for that care," such as "Protocols or other written authorization." 22 TEX. ADMIN. CODE § 221.13(d) (2007).[33] Those protocols are "jointly developed," agreed to and signed by the ANP and supervising physician, reviewed annually, and "maintained in the practice setting of the advanced practice nurse...." *Id.* §§ 221.1(12), 221.13(d)(2)(A)-(D). One function of protocols is to "verify authority to provide medical aspects of care." *Id.* § 221.13(d)(2)(E).

The "degree of detail" of a protocol "may vary" with the complexity of the case and the ANP's education, experience, and advanced practice specialty. *Id.*

----

**32.** § 157.006. Limitation on Board Rules Regarding Delegation

The board shall promote a physician's exercise of professional judgment to decide which medical acts may be safely delegated by not adopting rules containing, except as absolutely necessary, global prohibitions or restrictions on the delegation of medical acts.

**33.** § 221.13. Core Standards for Advanced Practice

....

(d) When providing medical aspects of care, advanced practice nurses shall utilize mechanisms which provide authority for that care. These mechanisms may include, but are not limited to, Protocols or other written authorization. This shall not be construed as requiring authority for nursing aspects of care.

§ 221.13(d)(1).[34] But the regulations state they may not be narrowly drawn to remove the ANP's discretion and professional judgment, as long the ANP's actions are commensurate with his or her training and experience. *See id.* § 221.1(12) (emphasis added):

(12) Protocols or other written authorization—.... Protocols or other written authorization shall be defined to promote the exercise of professional judgment by the advanced practice nurse commensurate with his/her education and experience. Such protocols or other written authorization *need not describe the exact steps that the advanced practice nurse must take with respect to each specific condition, disease, or symptom* and may state types or categories of drugs which may be prescribed rather that just list specific drugs.[35]

The same definition applies to a "protocol used by a reasonable and prudent physician exercising sound medical judgment" under the Medical Practice Act. TEX. OCC. CODE. ANN. § 157.055 (Vernon 2004).[36]

## DISCUSSION

The majority concludes Dr. Thomas is unqualified under Civil Practice and Reme-

dies Code section 74.402(b) to opine that ANP Lehman breached the standard of care applicable to him. The majority disagrees with Dr. Thomas's statement that ANP Lehman "assumed the duties of a physician" in examining, diagnosing, and treating Ms. Keppard and states "different standards of care from those applicable to physicians apply...." It states that ANPs are governed by "standards of professional nursing" and that Dr. Thomas is unqualified because he did not state he was familiar with the "standard of care of a nurse practitioner."

The majority also reasons that while ANPs are qualified to diagnosis medical conditions, they do so "within the protocols or other written authorizations signed by a doctor." It concludes that because Dr. Thomas did not show familiarity with "[p]rotocols or other written authorization" ANP Lehman must use when providing "medical aspects of care," and "which provide authority for that care," *see* 22 TEX. ADMIN. CODE § 221.13(d), Dr. Thomas "cannot know the standard of care applicable" to him in this case.

My review of the statutory and regulatory scheme set out above leads me to dis-

---

**34.** *See* 22 TEX. ADMIN. CODE § 221.13(d)(1) (2007):

.... The degree of detail within protocols/policies/practice guidelines/clinical practice privileges may vary in relation to the complexity of the situations covered by such Protocols, the advanced specialty area of practice, the advanced educational preparation of the individual, and the experience level of the individual advanced practice nurse.

**35.** *Accord,* 22 TEX ADMIN. CODE § 221.13(d)(1) (2007) ("Protocols or other written authorization shall promote the exercise of professional judgment by the advanced practice nurse commensurate with his/her education and experience.").

**36.** § 157.055. Orders and Protocols

A protocol or other order shall be defined in a manner that promotes the exercise of professional judgment by the advanced practice nurse and physician assistant commensurate with the education and experience of that person. Under this section, an order or protocol used by a reasonable and prudent physician exercising sound medical judgment:

(1) is not required to describe the exact steps that an advanced practice nurse or a physician assistant must take with respect to each specific condition, disease, or symptom; and

(2) may state the types or categories of medications that may be prescribed or the types or categories of medications that may not be prescribed.

agree. First, expert qualification under section 74.402(b)'s terms turns not on the particular credentialing of the defendant caregiver but on the expert's (1) competence with the "type of care" given and (2) knowledge of the standard governing diagnosis and treatment of the "condition involved in the claim...." *See* § 74.402(b)(1)-(2). Civil Practice and Remedies Code chapter 74 does not explicitly state that only an ANP or non-physician expert can opine on the standard of care of an ANP, or explicitly bar a physician from doing so simply because that expert is a physician and not an ANP.

Second, the Keppards' lawsuit specifically alleges negligent misdiagnosis and treatment by ANP Lehman of Ms. Keppard's condition that breached the standard of care of a physician. The Medical Practice Act defines "practicing medicine" to include "diagnosis" and "treatment" of physical conditions. Tex. Occ.Code § 151.002(a)(13). The Nursing Practice Act defines an ANP as a registered nurse with advanced practice nursing credentials. Tex. Occ.Code § 301.152. ANPs must comply with the Nursing Practice Act. 22 Tex. Admin. Code §§ 221.12(1), 221.13(a). The Nursing Practice Act generally bars nurses from "acts of *medical diagnosis* or the prescription of therapeutic or corrective measures," Tex. Occ.Code § 301.002(2), (4)-(5) (emphasis added), and no person may "practice medicine" without a medical license. Tex. Occ.Code § 155.001.

However, the Nursing Practice Act *does* define authorized "professional nursing" to include "medication or treatment *as ordered by a physician*" and "performance of *an act delegated by a physician*" under chapter 157 of the Medical Practice Act. Tex. Occ.Code § 301.002(2)(C), (G) (emphasis added). Authorized delegates under chapter 157 are "not considered to be practicing medicine without a license...."

Tex. Occ.Code § 157.005. My review of the governing statutes and regulations finds no authority for an ANP to independently perform "medical acts" of "diagnosis" and "treatment" but through a proper delegation by a supervising physician under the Medical Practice Act, at Tex. Occ.Code § 151.001(a)(1)-(2).

That Act imposes several conditions to the delegation that effectively incorporate a physician standard of care. First, in the "sound medical judgment" of a "reasonable and prudent" delegating physician, the act must be "properly and safely" delegable and "performed in its customary manner...." That plainly incorporates a physician's standard of care because the statute applies the "medical judgment" of a "reasonable and prudent" delegating physician to determine if the medical act has been performed in a "customary manner"; i.e., non-negligently.

Moreover, the statute requires that the delegate must be a "qualified and properly trained person acting under the physician's supervision" and physicians are governed by a physician standard of care. Here, Dr. Wilkin allegedly supervised ANP Lehman and signed Lehman's diagnosis and treatment record. Though physicians may delegate, the delegating physician "remain[s] responsible for the medical acts" delegated. Tex. Occ.Code § 157.001(b). Since liability of the supervising physician derives from the medical *act*, it makes no sense to impose a lesser or different standard to the *same act* simply because the act was performed by an ANP and not a physician. Indeed, there is a compelling policy justification, from the perspective of the expectations of all patients seeking competent medical care of a medical condition, to hold *any* provider performing a "medical act" of diagnosing or treating that condition to a medical or physician standard of care.

I agree with Dr. Thomas's report that ANP Lehman was "acting as a physician" and disagree with the majority that a separate standard of professional nursing applies here to Lehman's diagnosis and treatment of Ms. Keppard's condition. I have not found a provision in the nursing regulations creating a separate nursing standard of care governing medical diagnosis and treatment. To the contrary, the regulations *prohibit* ANPs from acting outside the scope of their advanced practice specialty or in violation of the Nursing Practice Act, *see* 22 Tex. Admin. Code §§ 221.12, 221.12(1), 221.13(a)-(b), and the Nursing Practice Act generally prohibits medical diagnoses and treatment without a physician's directive or delegation under chapter 157 of the Medical Practice Act. *See* Tex. Occ.Code § 301.002(2)(C), (G). And when "collaborating with other health care providers," ANPs must remain "accountable for knowledge of the statutes and rules relating to advanced practice nursing and function within the boundaries of the appropriate advanced practice category." 22 Tex. Admin. Code § 221.13(a).[37]

Finally, I disagree that knowledge of the ANP-physician protocols that authorized ANP Lehman to provide "medical aspects of care," *see* 22 Tex.Admin.Code § 221.13(d), is relevant to the standard of care applicable to him or determines an expert's qualification to opine on the standard governing the "medical aspects" of the care he delivered. The protocols are not in evidence, so we do not know what they say. But regardless of any claims the Keppards may ultimately make regarding them,[38] they still separately allege simple negligent medical diagnosis and treatment of Ms. Keppard's condition, and that is a matter on which Dr. Thomas is qualified to opine.

Furthermore, ANP-physician protocols do not substitute or create any standard of care at all. One of their functions is simply to "verify authority to provide medical aspects of care." *See* Tex. Admin. Code § 221.13(d)(2)(E). But they may not be drawn to supplant the "exercise of professional judgment by the advanced practice nurse commensurate with his/her education and experience" and "need not describe the exacts steps that the advanced practice nurse must take with respect to each specific condition, disease, or symptom" treated. *See* 22 Tex. Admin. Code § 221.1(12); Tex. Occ.Code § 157.055. Thus, they can have no bearing on whatev-

37. The majority cites 22 Tex. Admin. Code § 221.13(e) (2007), which states an ANP "shall retain professional accountability for advanced practice nursing care," concluding that an ANP is "accountable for advanced practice nursing care, but not for a doctor's care." That reads "retain" to mean "retain to the exclusion of any other standard of care." The plain meaning of "retain" is simply that an ANP remains liable under an ANP standard when performing advanced nursing practice acts, though the ANP may concurrently be performing delegated medical acts and thus held to a physician's standard of care in their performance.

38. The Keppards have not alleged Lehman is individually liable for failing to follow proto-

cols, develop protocols, or any act or omission relating to them. They have not alleged improper delegation under the Medical Practice Act or improper practice of medicine without a license if Lehman knew the delegation violated it. *See* Tex. Occ.Code § 157.005 (authorized delegates are "not considered to be practicing medicine without a license" unless the delegate knows the delegation and action taken under it violate the Medical Practice Act). The Keppards did allege Lehman negligently instructed other hospital personnel. But none of these types of allegations change the fact that the Keppards separately assert a simple medical negligence claim that assumes a proper delegation.

er standard of care ultimately governs.[39]

Certainly, in a suit against a *hospital* for negligence in failing to maintain adequate protocols authorizing health care providers to administer life-saving medications or deliver necessary medical services, expertise on what protocols a reasonably prudent, similarly situated hospital would have in place would be required to allow an expert to testify. *See, e.g., Reed v. Granbury Hosp. Corp.*, 117 S.W.3d 404, 407–08, 410–12 (Tex.App.-Fort Worth 2003, no pet.) (in granting summary judgment, trial court did not abuse discretion striking physician testimony under Texas Rule of Evidence 702, in suit solely against a hospital alleging lack of policies, procedures, and protocols that would have permitted physicians to administer stroke medication, where physicians had expertise in administering the medication, but lacked expertise on the standard to determine what protocols the hospital should have governing its administration).[40] *Reed* distinguished cases involving a "common or universal standard" applicable to a subject about which "any physician" was familiar. *Id.* at 412.[41]

In discussing a separate issue,[42] the *Reed* court stated: "In Texas, medical decisions are to be made by attending physicians." *Reed* also noted, "A hospital cannot practice medicine," concluding it is not directly liable for negligent "medical functions." 117 S.W.3d at 415 (citing, *inter alia*, TEX. OCC.CODE §§ 151.002(a)(13) (defi-nition of "practicing medicine") and 155.001, .003 (practicing medicine without a license is prohibited and hospitals cannot be so licensed)). Because hospitals and nurses may not "practice medicine" as defined by the Texas Occupations Code, there are plainly many situations where the standard of care governing them and the standard governing physicians differ, which the majority appears to recognize. However, I do not believe that difference, where it may exist, controls here. I therefore respectfully dissent.

---

**39.** *Cf. Reed v. Granbury Hosp. Corp.*, 117 S.W.3d 404, 413–14 (Tex.App.-Fort Worth 2003, no pet.) (nothing in hospital's "broad policies and statements" generally describing type and quality of care given "evidences a standard of care").

**40.** A dissent would have found lack of a hospital policy ensuring that a physician conformed to medical standards was sufficient evidence to at least raise a fact issue that the hospital's standard was breached. *Reed*, 117 S.W.3d at 416 (Livingston, J., dissenting).

**41.** *Reed* also held a qualified expert could opine on whether an existing protocol (e.g. allowing a physician-supervised, specialized nurse to administer anesthesia) met the standards within that expert's competence. *Reed*, 117 S.W.3d at 413, n. 6, 414 (distinguishing court's earlier precedent).

**42.** The court refused to find a nurse competent to testify on whether lack of a hospital protocol prevented administration of needed medication. *Reed*, 117 S.W.3d at 414–15.