

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00169-CV

_____

WOODLAND NURSING OPERATIONS, LLC F/D/B/A EASTLAND NURSING
& REHABILITATION AND TRINITY HEALTHCARE, LLC, Appellants

V.

MISTY VAUGHN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF
THOMAS VAUGHN, Appellee

On Appeal from the 236th District Court
Tarrant County, Texas
Trial Court No. 236-314075-19

Before Bassel, Womack, and Walker, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

In two issues, Appellants Woodland Nursing Operations, LLC f/d/b/a Eastland Nursing & Rehabilitation and Trinity Healthcare, LLC[1] challenge the trial court's denial of their motion to dismiss the health care liability claim of Appellee Misty Vaughn, individually and on behalf of the Estate of Thomas Vaughn, that she filed pursuant to the Medical Liability Act (MLA). *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 74.001–.507. Eastland moved to dismiss Vaughn's claim by asserting that the expert report that she had filed in support of her claim was inadequate because it failed to comply with requirements of the MLA.

Vaughn's claim against Eastland alleged that her husband Thomas had suffered a head injury while he was a patient at Eastland and was receiving rehabilitation to address a stroke that he had suffered prior to his admission to Eastland. The author of the expert report that Vaughn had filed opined that the second head injury was caused by a number of breaches of the appropriate standard of care by Eastland. Eastland does not challenge the expert's qualifications to formulate the opinions contained in the report or his formulation of the applicable standard of care. Instead, Eastland asserts that the expert's opinions on both the existence of a breach of the standard of care and causation are conclusory. We disagree. Though the report is not

---

[1]The petition in this matter states that both Appellants "managed, operated, supervised[,] and/or staffed Eastland Nursing and Rehabilitation Center." Thus, we refer to them collectively as Eastland.

2

a model of clarity, it provides facts to support (1) the expert's conclusions that Thomas suffered a new injury while a patient at Eastland, (2) why the expert concluded that Thomas would not have suffered the injury if Eastland had been using the protective measures required by the standard of care, and (3) how and why these breaches of the standard of care caused Thomas's injury. Accordingly, we affirm the trial court's order denying Eastland's motion to dismiss.

## II. Procedural and Factual Background

Procedurally, this is the second time that the parties have been before us on the question of the adequacy of the expert report. When Vaughn first filed suit, Eastland moved to dismiss, claiming that the expert report that Vaughn had filed did not comply with the MLA. The trial court denied Eastland's motion to dismiss, and Eastland perfected an interlocutory appeal to challenge that ruling. In that appeal, the parties filed a "Joint Motion to Reverse Order Below Pursuant to Agreement," which we granted, and we remanded the matter to the trial court.

After the remand, Vaughn served an amended expert report. In response to this filing, Eastland filed a "Motion to Dismiss for Failure to Cure Inadequate Chapter 74 Report." In turn, Vaughn responded to the motion, and then Eastland replied. The trial court heard argument on Eastland's motion and denied it, stating in its order that it was "of the opinion that the . . . [r]eport constitutes a good[-]faith effort to comply with the requirements of Chapter 74." Eastland has now perfected an appeal of that order.

3

With respect to the nature of Vaughn's claims, her amended petition alleged that Thomas had been admitted to Eastland's nursing and rehabilitation center for rehabilitation after suffering an intracerebral hemorrhagic stroke. The petition alleged that Eastland was required to formulate a comprehensive care plan for Thomas and that Eastland had represented that it was equipped to meet Thomas's needs. The allegations continue that Eastland failed to provide the care that Thomas needed and that he suffered abuse that caused a second cerebral hemorrhage. The petition stated that "[Thomas] informed his family that while he was in the shower that morning, the two nurse aides that assisted him hit him over the head, squeezed his testicles, pinched him, and struck him with a belt. After the shower, one of the aides kneed him in his testicles." The petition provided a chronology showing that two or three days after Thomas's admission to Eastland, he was discharged from that facility and then "admitted to Eastland Memorial Hospital, where he was diagnosed with a new cerebral hemorrhage as a result of the assault." After discharge from the local Eastland hospital, Thomas was transferred to a hospital in Arlington. According to the petition, Thomas was discharged from the Arlington hospital and placed in home hospice care. A few weeks after being placed in hospice, Thomas passed away. The petition alleged that Thomas's death was caused by a lack of care and by the abuse that he received at Eastland.

Based on its factual allegations, the petition alleged a cause of action for medical negligence and asserted that Eastland was liable for acts and omissions that included the following:

a. Failing to observe, intervene, and care for [Thomas];

b. Neglecting [Thomas] to such a degree that he was assaulted and suffered a cerebral hemorrhage and other injuries that would result in pain, suffering[,] and death[;]

c. Failing to provide the medical and nursing care reasonably required for [Thomas's] known conditions[; and]

d. Failing to provide the appropriate supervision and training to its staff and personnel that were providing care to [Thomas,] including appropriate care related to [Thomas's] treatment needs at all relevant times.

The petition also alleged causes of action for corporate negligence and gross negligence. The petition appears to allege damages for both a wrongful-death claim and a survival claim.[2]

---

[2]We have previously described the distinction between the two types of claims as follows:

Survival claims result from Texas Civil Practice and Remedies Code Section 71.021, which provides that a claim for injury to a person's health does not abate on death and may be prosecuted by "heirs, legal representatives, and the estate of the injured person." Tex. Civ. Prac. & Rem. Code Ann. § 71.021(a), (b). A wrongful-death claim is generally covered by the Texas Wrongful Death Act, and "damages recoverable in a wrongful[-]death action are for the exclusive benefit of the defined statutory beneficiaries and are meant to compensate them for their own personal loss." *Cunningham v. Haroona*, 382 S.W.3d 492, 508 (Tex. App.—Fort Worth 2012, pet. denied) (citing Tex. Civ. Prac. & Rem. Code Ann. § 71.002, defining wrongful-death cause of action).

After the first interlocutory appeal and the remand from this court, Vaughn submitted an amended expert report authored by Gregg Davis, a physician, to satisfy the expert-report requirements of the MLA. We will more fully detail Dr. Davis's eight-page, single-spaced report in the analysis section of this opinion, but we briefly note here that his report took a different tack than the petition. No mention was made in the report of an alleged assault on Thomas while he was in the shower.

Instead, the report began by noting Dr. Davis's clinical experience in the care of patients, such as Thomas, who spend time in "a nursing home, outpatient, and hospital environment." The report next outlined the records that Dr. Davis had reviewed regarding Thomas's care at various facilities, as well as a police report, the death certificate, and photos and videos.

The report next contained a "chronology of care" outlining that prior to admission to Eastland, Thomas had been hospitalized for an intercranial hemorrhage, and the report described the CT scans of that hemorrhage. The report stated that hospital staff were able to stabilize Thomas, "and after application of [a] soft helmet," he was transferred to Eastland where, at the time of the admission, he suffered from a number of medical conditions. The report described the following: (1) the

---

"Damages recoverable by the statutory beneficiaries under the Wrongful Death Act include pecuniary losses to the beneficiaries, such as loss of inheritance and non-economic damages to compensate for the losses caused by the destruction of the familial relationship." *Id.*

*Jacksboro Nursing Operations, LLC v. Norman*, No. 02-20-00262-CV, 2021 WL 1421431, at *9 n.3 (Tex. App.—Fort Worth Apr. 15, 2021, no pet.) (mem. op.).

6

assessment of Thomas when he arrived at Eastland; (2) the creation of a care plan that "did not address [the] assistance level required"; (3) notes that Thomas was supposed to wear a "soft helmet at all times when ambulating"; (4) documentation of a shower that he had received; and (5) a discharge summary that Eastland created several days after Thomas was discharged. The chronology concluded by noting that Thomas was transferred from Eastland to a local hospital. The report described a diagnosis obtained at that hospital of an intercranial hemorrhage and the findings of CT scans with respect to that hemorrhage. The chronology concluded with Thomas's family's decision to place him in hospice, the fact of his death, and a listing of the causes of death in his death certificate (i.e., cerebral hemorrhage, cirrhosis, and diabetes).

The report next outlined Dr. Davis's opinions "related to [a] [b]reach in [s]tandard of [c]are." This section began by outlining Dr. Davis's view of what the standard of care for Thomas required, including "a duty to prevent accidents and injury in all residents[] but particularly so in high-risk residents such as" Thomas. The report then outlined how Eastland had allegedly breached the standard of care by Eastland's failure to put into place a "comprehensive baseline care plan" that addressed Thomas's need for assistance in "ambulation and transfer," the failure in the notes of Thomas's care to show that he received the assistance he needed, and inconsistencies in the notes. Dr. Davis opined that the unreliability of Eastland's records called "into question the care provided to [Thomas] during the entirety of his stay." The report highlighted Dr. Davis's criticism that Eastland's records lacked the

following: (1) a baseline evaluation of Thomas's neurological status; (2) documentation of what prompted his transfer from Eastland to a local hospital; and (3) a comprehensive assessment of Thomas on admission and discharge. Dr. Davis opined that this deviation from the standard of care delayed the diagnosis of Thomas's injury and impeded his opportunity for recovery. Next, the report offered opinions on breaches of the standard of care by the corporate owner of Eastland.

The report then turned to Dr. Davis's opinions regarding causation. To support his conclusion that "there is a causal link between the failures set forth above and the injuries[,] including death[,] suffered by" Thomas, Dr. Davis stated that the "[n]ursing staff of Eastland failed to implement a care plan to prevent falls." Based on the absence of documentation in the records that he reviewed, Dr. Davis concluded that neither a soft helmet nor a shower chair was provided to Thomas. Further, Dr. Davis opined that "the interventions detailed on the care plan were not tailored to [Thomas's] needs as they should have been" and that "they did not include providing him with assistance at the level and of the kind he required." Dr. Davis summed up his conclusion by stating that

> [m]ore likely than not, [Thomas] was not provided adequate support, including use of [a] shower chair and support to protect his head. This in turn, more likely than not, led to [Thomas's] hitting his head against an object. Notes from the hospital[] indicate that he had suffered head trauma prior to admission. [Thomas] was transported from Eastland to the hospital. Again, because the nursing notes trail off and are poor, in breach of the standard of care, I can reasonably conclude within

8

reasonable medical probability that [Thomas] experience[d] a fall at the defendant facility. The force of hitting his head against an object led to tears in the blood vessels, causing bleeding into the space between the inner layer of the dura mater and the arachnoid mater of the meninges surrounding the brain. This buildup of blood placed pressure on [Thomas's] brain, causing damage to brain tissue. Decrease in brain function continued, however, leading to mental[-]status deterioration and accelerating brain[-]tissue dysfunction.

Dr. Davis concluded the report by stating that "[d]ue to [Eastland's] failures above stated, [Thomas] endured unnecessary and preventable suffering that resulted in [Thomas's] pain and suffering" and that all the opinions that he had expressed in the report were based on reasonable medical probability.

### III. Analysis

**A.  We set forth the expert-report requirements that apply to a health care liability claim, the substance that an expert report must contain, and the standard and scope of review that we apply to determine an expert report's sufficiency.**

"Chapter 74 of the Civil Practice and Remedies Code, also known as the [MLA], requires health care liability claimants to serve an expert report upon each defendant not later than 120 days after that defendant's answer is filed." *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a)). When a report is "found deficient," the trial court may grant a thirty-day extension "to cure the deficiency." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c).

"If the claimant fails to clear this substantive hurdle [of filing an adequate expert report], the trial court must dismiss the suit with prejudice and award

9

reasonable attorney's fees and costs to the affected defendant." *E.D. ex rel. B.O. v. Tex. Health Care, P.L.L.C.*, 644 S.W.3d 660, 664 (Tex. 2022) (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b)). The report requirement functions "to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims." *Abshire*, 563 S.W.3d at 223.

> The MLA requires an expert report to

> provide[] a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care[;] the manner in which the care rendered by the . . . health care provider failed to meet the standards[;] and the causal relationship between that failure and the injury, harm, or damages claimed.

Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6).

The test applied by the trial court in determining the sufficiency of the report is one of objective good faith. *Id.* § 74.351(*l*) ("A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good[-]faith effort to comply with the definition of an expert report in Subsection (r)(6)."). The Texas Supreme Court has held that a good-faith effort occurs when a report "(1) inform[s] the defendant of the specific conduct called into question and (2) provid[es] a basis for the trial court to conclude the claims have merit." *Abshire*, 563 S.W.3d at 223 (quoting *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018)).

Various general principles guide the determination of whether an expert report is sufficient. "A report 'need not marshal all the claimant's proof,' but 'a report that

10

merely states the expert's conclusions about the standard of care, breach, and causation' is insufficient." *Id.* (quoting *Am. Transitional Care Ctrs. of Tex. v. Palacios*, 46 S.W.3d 873, 878–79 (Tex. 2001)). Nor does a report have to meet the standards of summary-judgment evidence. *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 517 (Tex. 2017) ("We remain mindful that an 'adequate' expert report 'does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial.'" (quoting *Scoresby v. Santillan*, 346 S.W.3d 546, 556 n.60 (Tex. 2011))). Also, an expert report need not convince the reader that its conclusions are reasonable. *See Abshire*, 563 S.W.3d at 226 (stating that at the "preliminary [expert-report] stage, whether th[e] standards [referenced in the report] appear reasonable is not relevant to the analysis of whether the expert's opinion constitutes a good-faith effort" (quoting *Miller*, 536 S.W.3d at 516–17)).

The following statutory provisions guide the determination of whether the expert making the report is qualified and whether the report adequately describes the applicable standard of care and explains causation:

- The MLA provides specific criteria to determine if the expert making a report is qualified. "'Expert' means[] with respect to a person giving opinion testimony regarding whether a health care provider departed from accepted standards of health care, an expert qualified to testify under the requirements of Section 74.402." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(B). In turn, Section 74.402(b) provides that

11

[i]n a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

> (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;
>
> (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
>
> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

*Id.* § 74.402(b).[3] In making the determination of whether an expert is qualified on the basis of training or experience, the trial court considers whether the witness

> (1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and
>
> (2) is actively practicing health care in rendering health care services relevant to the claim.

*Id.* § 74.402(c). The expert's qualifications must appear in the report or in a curriculum vitae and cannot be inferred. *See Savaseniorcare Admin. Servs.,*

---

[3]Subsection (1) of Section 74.402(b) applies only if the provider is an individual. *See Premieant Inc. v. Snowden ex rel. Snowden*, No. 04-19-00238-CV, 2020 WL 1159055, at *3 n.4 (Tex. App.—San Antonio Mar. 11, 2020, no pet.) (mem. op.).

*L.L.C. v. Cantu*, No. 04-14-00329-CV, 2014 WL 5352093, at *2 (Tex. App.—San Antonio Oct. 22, 2014, no pet.) (mem. op.); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (requiring service of "a curriculum vitae of each expert listed in the report").

- "To adequately identify the standard of care, an expert report must set forth 'specific information about what the defendant should have done differently.'" *Abshire*, 563 S.W.3d at 226 (quoting *Palacios*, 46 S.W.3d at 880). "While the Act requires only a 'fair summary' of the standard of care and how it was breached, 'even a fair summary must set out what care was expected[] but not given.'" *Id.* (quoting *Palacios*, 46 S.W.3d at 880).

- On the issue of causation, the report must "explain 'how and why' the alleged negligence caused the injury in question." *Id.* at 224. Conclusory descriptions of causation are not adequate; "the expert must explain the basis of his statements and link conclusions to specific facts." *Id.* But "[i]n satisfying th[e] 'how and why' requirement, the expert need not prove the entire case or account for every known fact; the report is sufficient if it makes 'a good-faith effort to explain, factually, how proximate cause is going to be proven.'" *Id.* (quoting *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017)). Further, "[t]he sufficiency of the expert report's causation statement should be viewed in the context of the entire report." *Columbia Med. Ctr. of Arlington Subsidiary L.P. v. L.M.*, No.

02-17-00147-CV, 2018 WL 1095746, at *7 (Tex. App.—Fort Worth Mar. 1, 2018, no pet.) (mem. op.). Finally, "the detail needed to establish a causal link generally is proportional to the complexity of the negligent act giving rise to the claim." *Id.* In other words, a "causation opinion is not conclusory simply because it is not complex." *Id.* And the supreme court has recently reemphasized that a good-faith effort occurs when the form of the report provides an explanation of the "how and why" of causation that is more than conclusory. *Tex. Health Care*, 644 S.W.3d at 667. When the report meets this requirement, it is adequate, even if we are skeptical of the opinions expressed or conclude that they will ultimately fail to meet the standards of proof required at trial. *Id.*

We apply an abuse-of-discretion standard to test the trial court's decision to grant or deny a motion to dismiss that challenges the adequacy of an expert report. *Abshire*, 563 S.W.3d at 223. The scope of our review is limited to "the information contained within the four corners of the report." *Id.*

## B. We set forth why we overrule Eastland's challenges to Dr. Davis's report.

Eastland does not challenge Dr. Davis's qualifications and is explicit in its reply brief that it does not challenge how Dr. Davis articulated the appropriate standard of care for Thomas.[4] Instead, Eastland argues that Dr. Davis's report is conclusory on

---

[4]Dr. Davis states the applicable standard of care as follows:

14

the issues of breaches in the standard of care and medical causation. We reject both arguments. Eastland bases its arguments on a portrayal of the report that turns a blind eye to the facts that Dr. Davis relied on to form his opinions. To reiterate, the question of whether Dr. Davis drew reasonable inferences from those facts is not before us.

**1.    Dr. Davis's report adequately describes the medical causation of Thomas's injury.**

In its first issue, Eastland backs into its challenge of Dr. Davis's report by highlighting deficiencies in his initially filed report, which was the subject of the prior appeal. The deficiencies in that report are not the question before us; our focus is on the amended report that Dr. Davis filed after the case was remanded to the trial court.

With one paragraph each, Eastland makes its two attacks on the report for failing "to provide any meaningful analysis of medical causation or explain how any alleged breach in the standard of care proximately caused an injury to" Thomas.

The paragraph launching Eastland's first attack states in whole that

> In order to meet the standard of care, Eastland . . . is required to provide a level of care and treatment that an otherwise reasonable and prudent, similar facility and staff would provide under the same, or similar, circumstances. Specifically, in order to meet the standard of care[,] a skilled nursing facility such as Eastland must ensure that its residents receive and are provided with the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being. Skilled nursing facilities such as Eastland have a duty to prevent accidents and injury in all residents[] but particularly so in high-risk residents such as [Thomas].

15

the Second Davis Report *does not identify a single injury allegedly sustained by* [*Thomas*]. Dr. Davis vaguely refers to "head trauma" purportedly sustained by [Thomas,] but Dr. Davis does not explain or identify the specific nature of the head trauma or how that trauma differed, if at all, from that suffered pre-admission by [Thomas]. An explanation of the "head trauma" is particularly important in this case because [Thomas] was admitted to Eastland *after* suffering a massive intracranial hemorrhage. *Dr. Davis claims that* [*Thomas*] *was diagnosed with an acute intracranial hemorrhage following his discharge from Eastland, but he specifically does not state that the hemorrhage was the result of any actions or inactions of Eastland. Dr. Davis does not explain the intracranial hemorrhage or link it to any specific conduct of Eastland.* Rather, Dr. Davis vaguely claims that because Eastland records do not specifically show [that Thomas] was provided a shower chair – though the records do clearly show that [Thomas] was supervised in the shower and sustained no fall – that he must have fallen and hit his head on some unknown object at some unknown point in time and sustained unexplained "head trauma." The causation analysis set forth in the Second Davis Report is conclusory and speculative. [Emphases added in italics.]

As we interpret this argument, it focuses on the alleged failure of Dr. Davis's report to explain how Thomas fell. That this is the focus of Eastland's attack becomes clearer in its reply brief where it argues that

Dr. Davis is flatly unable to explain "how" [Thomas] sustained an injury. Dr. Davis assumes that [Thomas] sustained a fall[] but does not state when, where, or how the fall occurred or explain how the fall, if it occurred at all, was proximately caused by Appellants. *Absence of evidence of a fall is not evidence of a fall.*

Eastland's argument—that Dr. Davis fails to explain the fact and mechanism of Thomas's post-Eastland-discharge hemorrhage—ignores many of the statements in Dr. Davis's report. The report stated Dr. Davis's opinion that Thomas experienced a new head injury while at Eastland. The report began by describing the clinical findings made regarding a hemorrhage in Thomas's brain before his admission to

Eastland. Dr. Davis highlighted the fact that CT scans reflected that the injury was "*with no midline shift.*" The chronology ended with a description of the clinical findings made by the local hospital with respect to another hemorrhage in Thomas's brain after his transfer from Eastland. Dr. Davis recited that the notes of the second injury indicate that Thomas "was struck in the head." Much later in the report after describing why he concluded that Thomas had struck his head while he was a patient at Eastland, Dr. Davis stated, "It is due to these injuries that [Thomas] more likely than not suffered [a] head injury causing new acute intracranial hemorrhage with midline shift."

Dr. Davis's report also noted that the paperwork for Thomas's admission to Eastland "document[ed] a right eyebrow abrasion as the only facial injury shown." Later in the report, Dr. Davis recited that he had reviewed photographs showing bruising to Thomas's face and the left side of Thomas's head. The report then stated,

> It can be reasonably concluded that [Thomas] suffered a trauma and/[]or bumping to the head, more likely than not caused by failing to provide him with needed assistance. [Thomas] required wearing [a] soft helmet due to his increased . . . risk for head injury. Notes are silent regarding [Thomas's] wearing his helmet. Had [Thomas] been wearing his soft helmet as he was supposed to, [Thomas] more likely than not would not have suffered bruising to head as shown in photographs.

We will discuss how Dr. Davis contended that Eastland deviated from the required standard of care in the next section of this opinion; the report stated that the deviations led to the new injury that Dr. Davis opined that Thomas had suffered:

17

More likely than not, [Thomas] was not provided adequate support, including use of [a] shower chair and support to protect his head. This in turn, more likely than not, led to [Thomas's] hitting his head against an object. Notes from the hospital[] indicate that he had suffered head trauma prior to admission.

Another opinion expressed in the report about a breach in the standard of care noted a lack of care in planning for Thomas. Dr. Davis also concluded from the records that he had reviewed that the absence of entries showing certain protective measures were taken created the inference that the measures were not taken.

With this context in place, we quote the section of Dr. Davis's report addressing causation:

It is my opinion that there is a causal link between the failures set forth above and the injuries[,] including death[,] suffered by [Thomas].

Nursing staff of Eastland failed to implement a care plan to prevent falls. The care plan called for the use of a soft helmet and should have included use of a shower chair as nursing staff assessed this as necessary. I have concluded that the fall care plan was not implemented because there is no documentation of a shower chair being used or a soft helmet being used. When care is not documented, I can reasonably conclude the care was not provided as when care is not documented, it was not performed. It is the standard of care that all services provided to a patient are to be documented, and if they are not documented, they did not occur. Further, the interventions detailed on the care plan were not tailored to [Thomas's] needs as they should have been. Specifically, they did not include providing him with assistance at the level and of the kind he required. On 4/15/2018, nursing staff did not provide [Thomas] with adequate assistance. [Thomas] was documented as being combative and agitated surrounding the time of his shower. Despite nursing staff documenting that he required assistance of a male aide, he was not provided this level of assistance. There is also no documentation to demonstrate that [Thomas] was wearing his soft helmet. Agitation would have increased [Thomas's] thrashing around, increasing his chances of hitting his head. Additionally, [Thomas]

18

required shower via [a] shower chair. This was not provided, increasing his risk for falls and head injury. More likely than not, [Thomas] was not provided adequate support, including use of [a] shower chair and support to protect his head. This in turn, more likely than not, led to [Thomas's] hitting his head against an object. Notes from the hospital[] indicate that he had suffered head trauma prior to admission. [Thomas] was transported from Eastland to the hospital. Again, because the nursing notes trail off and are poor, in breach of the standard of care, I can reasonably conclude within reasonable medical probability that [Thomas] experience[d] a fall at the defendant facility. The force of hitting his head against an object led to tears in the blood vessels, causing bleeding into the space between the inner layer of the dura mater and the arachnoid mater of the meninges surrounding the brain. This buildup of blood placed pressure on [Thomas's] brain, causing damage to brain tissue. Decrease in brain function continued, however, leading to mental[-]status deterioration and accelerating brain[-]tissue dysfunction.

We acknowledge that Dr. Davis's report is disjointed, but it is our duty to read it as a whole. When read as a whole, we do not agree that it either fails to state how Thomas suffered a head injury or that it is a valid challenge to the adequacy of the report that it does not "link it to any specific conduct of Eastland." Dr. Davis states facts based on the clinical records of Thomas's hemorrhages and his comparison of Eastland's documentation of Thomas's physical condition at admission versus photos taken later showing that Thomas had suffered a new injury while at Eastland. Dr. Davis said that the evidence of the injury that he noted would not have occurred had Thomas been wearing the protective helmet that Eastland claims he was wearing or if Thomas had been properly evaluated and had received the level of care that his condition required—simply, protective measures that should have been in place so that Thomas would not have suffered the injury that was documented when he was

19

transferred to the local hospital. Contrary to Eastland's argument, Dr. Davis opined that there was a fall (though admittedly he does not know how it occurred). At bottom, and though not artfully done, Dr. Davis provided facts to support his conclusion regarding how and why Thomas suffered a second head injury.

Nor can we adopt the logic of Eastland's argument that when an expert finds various failures in the records maintained by the health care provider but concluded the patient was injured while in the provider's care, a report is deficient because it fails to detail the injury-causing event suffered by the patient, i.e., Eastland's argument that "[*a*]*bsence of evidence of a fall is not evidence of a fall.*" Dr. Davis's report explicitly criticized Eastland's records for not documenting the condition that warranted his transfer to the local hospital. Under Eastland's logic, a provider's best course would be not to document the injury. This would leave the report—even though the expert detailed why he had concluded that an injury had occurred and how the injury should not have occurred if the patient had received the protective measures that the provider claims that the patient received—inadequate because the expert could not describe what was unknowable at the time of creation of the report because of deficiencies in the records. Certainly, what did or did not occur may later be revealed in discovery, but what may be uncovered in discovery is not known when an expert report is served because any discovery other than for medical records or hospital records is stayed until service of the expert report. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(s).

Thus, Eastland's challenges to Dr. Davis's opinions on causation fail because the report is a good-faith effort in that it provides an explanation of causation that is more than bare conclusions: it offers facts and then explains the how and why of Thomas's injury. By this effort, the report achieves the requisite level of detail, which as the First Court of Appeals explained is not onerous:

> The expert must simply provide some basis that a defendant's act or omission proximately caused injury. And, the expert must explain the basis of his statements and link his conclusions to the facts. "No particular words or formality are required [in the expert report], but bare conclusions will not suffice."

*Pinnacle Health Facilities XV, LP v. Chase*, No. 01-18-00979-CV, 2020 WL 3821077, at *12 (Tex. App.—Houston [1st Dist.] July 7, 2020, no pet.) (mem. op.) (citations omitted).

And again, the testing of whether Dr. Davis's opinions are reasonable is for another day. *See Tex. Health Care*, 644 S.W.3d at 667. Dr. Davis was allowed to draw the inferences from the records that he reviewed, and even if those inferences appear flawed, a motion challenging the adequacy of the report is not the proper vehicle to test the reasonableness of the inferences. As the First Court of Appeals also noted,

> [Appellant] complains that [the expert] improperly inferred that [the patient's] bedrails were not in place on the night of his fall. In assessing the sufficiency of a report, a trial court may not draw inferences; instead, it must exclusively rely upon the information contained within the four corners of the report. *In re McAllen Med. Ctr.*[*, Inc.*], 275 S.W.3d [458,] 463 & n.14 [(Tex. 2008) (orig. proceeding)]. However, [S]ection 74.351 does not prohibit experts, as opposed to courts, from making inferences from the medical records. *See Clavijo v. Fomby*, No. 01-17-00120-CV, 2018 WL 2976116, at *10 (Tex. App.—Houston [1st Dist.] June 14,

21

2018, pet. denied) (mem. op.). Whether an expert's factual inferences in the report are accurate is an issue for summary judgment, not a Chapter 74 motion to dismiss. *See id.*

*Pinnacle Health Facilities*, 2020 WL 3821077, at *12.

Eastland's second argument in support of its first issue—also contained in but one paragraph—mimics the first argument that we addressed dealing with the adequacy of Dr. Davis's opinion on causation:

> Dr. Davis does not explain the intracranial hemorrhage or link it to any specific conduct of Eastland other than an alleged documentation failure. Poor documentation or the lack of documentation does not and cannot cause an intracranial hemorrhage. [Thomas] was admitted to Eastland with an intracranial hemorrhage, discharged against medical advice, and presented to the hospital more than twenty-four hours later with an intracranial hemorrhage. Dr. Davis ignores these facts and contends that [Thomas] must [have] fallen and hit his head on some unknown object at some unknown point in time and sustained the head trauma during his residency at Eastland, essentially attempting to replace medical causation with a *res ipsa loquitor* analysis. [Eastland has] no idea what specific new injury [it is] alleged to have proximately caused [Thomas] or how such new injury purportedly occurred at Eastland. Dr. Davis also does not know and does not so state in the Second Davis Report. The Second Davis Report fails to adequately address medical causation or cure the First Davis Report and does not comply with Section 74.351.

Without repeating our previously stated reasons for rejecting Eastland's arguments, we will note our specific disagreements with Eastland's premises:

- Dr. Davis described the clinical findings of the hospital into which Thomas was admitted after his discharge from Eastland, and Dr. Davis stated why he had concluded that the documented injury was caused by Eastland's failures. He may well be wrong in his conclusions, but again we are

22

examining whether the form of his report is conclusory, not the ultimate validity of his conclusions.

- Eastland relies on facts that are not in our record regarding the chronology of Thomas's discharge from Eastland and his admission to a local hospital.[5] Dr. Davis may well have ignored these facts, but we do not have a way to know whether he did or not. And the time lag is not ignored by Dr. Davis. The report noted a discrepancy about the date of Thomas's discharge as follows: "Medical records document discharge on 4/15/2018. However, medication administration records show provision of wound care to [Thomas] and administration of other treatments on 4/16/2018, including treatments that would require assessment of [Thomas]." Again, whether this portrayal of the records is accurate, we cannot say.[6]

---

[5]Vaughn challenged Eastland's reliance on extrinsic evidence not contained in the trial-court record. The trial court sustained Vaughn's objection, and Eastland raises no issue on appeal complaining of that ruling.

[6]Eastland's opening brief contains a footnote that states,

In a strange attempt to justify his false representation concerning [Thomas's] dates of residency, Dr. Davis cites a medical record which he claims shows the facility provided care to [Thomas] on April 16, 2018 – that record, however, is clearly that of another resident whose name appears on the record.

The statement is not supported by a record reference.

23

- It is too crabbed a view of the report to conclude that Eastland has "no idea what specific new injury [it is] alleged to have proximately caused [Thomas] or how such new injury purportedly occurred at Eastland." Again, Dr. Davis's report described the clinical findings made when Thomas was admitted to the hospital after being in Eastland's care and how the injuries in the photos that Dr. Davis had reviewed would not have occurred if he had been wearing the protective helmet that Eastland's records claim he was wearing or had he been properly evaluated and cared for.[7]

### 2. Dr. Davis's report adequately describes how Eastland breached the standard of care.

In its second issue, Eastland also takes the approach of parsing Dr. Davis's opinions with respect to deviations from the standard of care by arguing that "[n]ot only does the Second Davis Report fail to identify the specific injury, if any, sustained by [Thomas] at Eastland, it fails to explain how [Eastland] breached the standard of

---

[7]Vaughn did plead in her amended petition that Thomas claimed that he had been assaulted in the shower. Eastland emphasizes that Dr. Davis makes no mention of an assault. The allegation in the pleading reports what Thomas told his family. The statement does not exclude the possibility that he experienced a fall and is not a judicial admission that he did not experience a fall. *See Estate of Stavron*, No. 02-20-00404-CV, 2021 WL 5227081, at *7 (Tex. App.—Fort Worth Nov. 10, 2021, no pet.) (mem. op.) (stating that a judicial admission must be deliberate, clear, and unequivocal). The amended petition also alleges various theories of negligence. A report need only support a single theory of liability. *Jacksboro*, 2021 WL 1421431, at *8 ("Succinctly, the Texas Supreme Court held that a report that satisfies the requirements, 'even if as to one theory only, entitles the claimant to proceed with a suit against the physician or health care provider.'" (quoting *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013))). Thus, we do not view the report's failure to mention Thomas's claim that he was assaulted as being fatal to Vaughn's claim.

24

care leading to the alleged injuries." As before, we reject Eastland's arguments because they unreasonably cabin the opinions and supporting facts contained in the report.

First, Eastland characterizes Dr. Davis's report as turning on the contention that there was a breach of the standard of care for not providing Thomas a shower chair and for not using a soft helmet in the shower and also turning on the assumption that he hit his head in the shower, though in Eastland's view, Dr. Davis did not come out and claim that. Pivoting off this argument, Eastland again argues that the report leaves it to conjecture how Thomas was injured:

> Dr. Davis simply contends that [Thomas] did not have access to a shower chair and soft helmet – never mind that the nurse's notes document that [Thomas] was wearing his soft helmet around the facility – and thus, fell and/or hit his head on an unknown object. No further details are provided such as when the fall occurred; where the fall occurred; how the fall occurred; how the fall could have been prevented; or what [Thomas] allegedly hit his head on in the fall. Dr. Davis is flatly unable to explain "how" [Thomas] sustained any new injury. Dr. Davis is unable to even state whether [Thomas] fell.

Eastland then highlights Dr. Davis's attack on Eastland's care for not having a male aide assist Thomas in the shower. Eastland notes that the report acknowledged that a female aide had assisted Thomas and that a male aide was assisting another patient in the shower. Thus, Eastland argues that it is criticized for an act—having a female aide assist Thomas—that produced no injury to Thomas. Based on this portrayal of the report, Eastland concludes that "[t]his informs [Eastland] of no

25

wrongdoing and certainly not how [Eastland] breached the standard of care and caused an injury to [Thomas]."

Shifting gears in its reply brief, Eastland rehashes its attack that the report does not adequately describe what injury Thomas actually suffered. The failings that it catalogs are as follows: (1) a lack of an explanation regarding how the head trauma that Thomas suffered after being in Eastland's care differed from his preadmission head trauma; (2) a failure to state that the second trauma resulted from Eastland's actions, arguing again that poor documentation cannot cause a head injury; and (3) failing to explain the more-than-twenty-four-hour gap between Thomas's discharge from Eastland and his admission to a local hospital.

Again, we reject Eastland's efforts to tell us that Dr. Davis's opinions are faulty because they are at odds with the medical records as those records show that Thomas was not admitted to the local hospital for more than twenty-four hours after his discharge from Eastland or that nurses' notes show that Thomas was wearing a soft helmet around the facility. We do not know what the records actually state. And we have already noted that Dr. Davis's report indicated that Eastland's records document care in the twenty-four-hour period that Eastland highlights and, as indicated below, speak of Thomas's being transported from Eastland to the hospital.

As we read Dr. Davis's report, his premise is simple: after reviewing the medical records of Thomas's original injury and the ones when he was admitted to the local hospital after being in Eastland's care, the records reflect that Thomas had

26

suffered another head injury. As we have documented, Dr. Davis stated some factual basis for this opinion. The report also outlined a number of deviations from the standard of care that Dr. Davis opined are an explanation for why Thomas suffered this injury and how those injuries that Thomas exhibited would not have been present had the protective gear—which Eastland claims that Thomas wore—actually been worn at the time of the injury. Eastland's fundamental attack—that the deviations are not tied to the new injury—ignores these facts.

The report also marched through what Dr. Davis opined are breaches of the standard of care throughout the course of Thomas's stay at Eastland. Dr. Davis began with Thomas's admission to Eastland:

> In the present case, there was a deviation in the standard of care by nursing staff of Eastland. No comprehensive baseline care plan was put in place for [Thomas] when he [was] admitted to the facility. This baseline care plan would have needed to include providing [Thomas] with [the] assistance of at least one person for ambulation and transfer. That was not done in the present circumstances. The baseline/[]interim care plan simply included a fall mat and wearing his soft helmet when up. Despite being noted to have increased confusion and a decreased level of comprehension, [Thomas's] care plan did not include providing him with assistance of a staff member.

The report then noted how the care that Thomas received during his stay at Eastland was inadequate by noting that "[t]he standard of care requires that residents who need assistance with ADL[] receive the needed assistance. [Thomas] was not provided the level of assistance he needed."

It is at this point that the report documented specific failings, including those associated with the shower incident. Dr. Davis opined on both Thomas's not receiving the required care and what the evidence of Thomas's injuries revealed as to whether he had received what he should have been accorded under the standard of care:

> Based off of my training and experience, when care is not documented at a facility, this denotes that the care was not performed. It is imperative that all care and treatment given to a resident, like [Thomas] be documented, so that the next shift(s) will know what treatments have been given and/or what treatments need to be given. All these are deviations from the standard of care. It is a breach of the standard of care to assess a resident as needing a certain level of assistance (male aide) and then failing to provide this level of assistance. Photographs show bruising to face and left side of head. It can be reasonably concluded that [Thomas] suffered a trauma and/[]or bumping to the head, more likely than not caused by failing to provide him with needed assistance. [Thomas] required wearing [a] soft helmet due to his increased . . . risk for head injury. Notes are silent regarding [Thomas's] wearing his helmet. Had [Thomas] been wearing his soft helmet as he was supposed to, [Thomas] more likely than not would not have suffered bruising to [his] head as shown in photographs.

Next, Dr. Davis documented the failings he saw in the end of the chronology of Thomas's stay at Eastland and how that tied to the prior deviations from the standard of care:

> The nursing staff at Eastland . . . breached the accepted standard of care by not producing a comprehensive baseline evaluation of his neurological status and a contemporaneous documentation of the events leading to [Thomas's] admission to Eastland Hospital emergency department and transfer to Medical City of Arlington on 4/16/2018. A breach in the standard of care occurred when nursing staff failed to perform a comprehensive assessment of [Thomas] upon admission and then again failed to provide [Thomas] with a discharge assessment.

28

Dr. Davis then explained why he saw an additional deviation of the standard of care because Eastland did not "document all significant changes in a patient's condition concurrently." It appears that this opinion takes two forms: (1) failing to document what necessitated Thomas's transfer to a local hospital; and (2) "fail[ing] to provide the generally accepted level of care, which would [have] be[en] provided by a similar facility under similar clinical circumstances." The section dealing with deviations from the standard of care concluded as follows:

> The lack of documentation indicates [that] the nursing staff failed to provide any additional care before his transfer to . . . Medical City of Arlington. This breach was proximate to and contributed to the decline in [Thomas's] health, resulting in a delay in the diagnosis of his intracranial hemorrhage. Patients with an intracranial hemorrhage require emergent neurosurgical evaluation. With a delay in diagnosis, the resulting compressive effect on the brain results in a reduction in blood flow to the brain, an increased risk of brain herniation, and a progressive neurological deterioration. The delay in diagnosis adversely impacted his opportunity for recovery and survival.

We agree that Dr. Davis's report could have been more coherent and could have stated his conclusions with greater precision. But the measure for stating the standard of care is that "an expert report must set forth 'specific information about what the defendant should have done differently.'" *Abshire*, 563 S.W.3d at 226 (quoting *Palacios*, 46 S.W.3d at 880). The report details what should have been done differently. And many of these failings documented by Dr. Davis are not simply free-floating deviations that cannot be tied to the new injury. Dr. Davis opined in general that the care plan for Thomas did not address his needs and also specifically opined

that if Thomas had been accorded the appropriate standard of care, such as the required wearing of a soft helmet, he would not have displayed the injuries portrayed in the photos examined by Dr. Davis. Dr. Davis did not state how the injury that he believes occurred specifically occurred but highlighted that the records that should have explained why there was an injury that required Thomas's transfer to a local hospital should have been, but apparently were not, created and how that failure delayed proper diagnosis that might have produced a better outcome. The four corners of Dr. Davis's report provide enough facts to take Dr. Davis's opinions beyond bare conclusions that there were deviations from the standard of care that had more than a theoretical effect on Thomas's condition. Here, the trial court's decision was perhaps a close call, but close calls fall within the discretion of the trial court. *See Tex. Health Care*, 644 S.W.3d at 664 ("This adequacy inquiry is confined to the four corners of the report, taken as a whole, . . . and under an abuse-of-discretion standard, "'[c]lose calls must go to the trial court.'" (quoting *Larson v. Downing*, 197 S.W.3d 303, 304 (Tex. 2006))).

### 3. We set forth authority dealing with expert reports addressing a patient's fall.

To support our holdings, we contrast opinions dealing with patient falls—one that holds that a report is adequate and another that holds the report inadequate. The contrast supports our conclusion that Dr. Davis's report lands on the adequate side of the balance.

The First Court of Appeals, in an opinion that we have already cited, dealt with a patient's fall and noted that the expert-report stage of a proceeding is not one in which causation must be proven by a preponderance of the evidence; it then outlined a number of cases upholding the adequacy of reports with conclusions similar to those drawn by Dr. Davis. *See Pinnacle Health Facilities*, 2020 WL 3821077, at *6.

In *Pinnacle Health Facilities*, the expert report noted, as does Dr. Davis's, how the fall injured the patient's brain structure.[8] The report went on to opine

> that there was no fall-prevention program in place at Pinnacle and that, "[h]ad side rails been present and raised" on [the patient's] bed on the night of his fall, "this would have greatly reduced the chance of his getting out of bed and falling." And, had a bed-pressure alarm been used, nursing staff would have been alerted and been given an opportunity to respond and intervene.

*Id.* at *12. The First Court concluded that in the context of an expert report and when comparing the opinion to holdings in similar cases, the report adequately stated an opinion on causation:

> At this pre-discovery stage, appellees' burden is not to prove a causal link by a preponderance of the evidence to the satisfaction of a factfinder or to rule out all other possible causes of injury. *See Palacios*,

---

[8]Specifically, Dr. Davis does the same in his report by describing the injury process as follows:

> The force of hitting his head against an object led to tears in the blood vessels, causing bleeding into the space between the inner layer of the dura mater and the arachnoid mater of the meninges surrounding the brain. This buildup of blood placed pressure on [Thomas's] brain, causing damage to brain tissue. Decrease in brain function continued, however, leading to mental[-]status deterioration and accelerating brain[-]tissue dysfunction.

31

46 S.W.3d at 879; *Puppala v. Perry*, 564 S.W.3d 190, 202 (Tex. App.—Houston [1st Dist.] 2018, no pet.) ("At this expert-report stage, an expert report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial."). We conclude that [the expert's] report provides a fair summary of the causal relationship between Pinnacle's failure to meet the applicable standard of care and [the patient's] injuries and death. *See* Tex. Civ. Prac. & Rem. Code [Ann.] § 74.351(r)(6); *see, e.g.*, *Nexion Health at Beechnut, Inc. v. Moreno*, No. 01-15-00793-CV, 2016 WL 1377899, at *3–5 (Tex. App.—Houston [1st Dist.] Mar. 29, 2016, no pet.) (mem. op.) (holding expert report adequate as to causal connection between nursing home's failure to supervise resident and death resulting from head wound from fall in hallway); *Regent Care Ctr. of Laredo, Ltd. P'ship v. Abrego*, No. 04-07-00320-CV, 2007 WL 3087211, at *6 (Tex. App.—San Antonio Oct. 24, 2007, pet. denied) [(mem. op.)] (holding experts' reports, opining that had facility appropriately assessed, evaluated, and implemented fall-prevention and safety measures for patient, patient would not have sustained injuries that diminished her ability to respond to congestive heart failure, constituted good-faith effort to provide fair summary of ca[us]al relationship between facility's action and patient's death); *Estate of Birdwell v. Texarkana Mem'l Hosp., Inc.*, 122 S.W.3d 473, 479–80 (Tex. App.—Texarkana 2003, pet. denied) (holding expert's report gave fair notice to hospital that cause of patient's hemorrhages and paralysis was her fall resulting from hospital's failure to provide restraints as additional fall protection). Thus, [the expert's] report presents an objective, good[-]faith effort to comply with the statute. *See* Tex. Civ. Prac. & Rem. Code [Ann.] § 74.351(*l*); *Scoresby*, 346 S.W.3d at 555–56.

*Id.*

Recently, the Amarillo Court of Appeals contrasted the holding in *Pinnacle Health Facilities* to facts before it and concluded that the report it reviewed was deficient because it did not provide what specific interventions would have prevented a fall by a patient:

The deficiencies in [the expert's] report are apparent when compared to a report [that] does satisfy the requirements of [S]ection 74.351. For example, *Pinnacle . . .* also involved an injury resulting from a fall and

considered whether the standard of care was adequately addressed in an expert report. . . . 2020 WL 3821077, at \*4 . . . . In *Pinnacle*, the defendant care center argued that the expert's report was inadequate with respect to the standard of care because the expert opined that the standard requires an "adequate fall prevention program" and a "safe environment." *Id.* However, the appellate court determined that the report was adequate because the expert provided specific information to support his conclusions, namely that the standard of care required the care center to "have raised side rails whenever [decedent] was in bed" and to implement fall safety and protections measures including an operating bedside call button, bedside toileting device, bed-pressure alarm, and video monitoring of decedent's room. *Id.* at \*[11]. Thus, the expert explained what steps an ordinarily prudent health care provider would take under the same or similar circumstances. *Id.* In contrast to the report challenged in *Pinnacle*, [the expert's] report does not identify what specific interventions should have been implemented by the facility or by the nurses, or what changes to [the decedent's] care were required.

*Kenmar Residential HCS Servs., Inc. v. Uriegas*, No. 07-21-00233-CV, 2022 WL 843890, at \*4 (Tex. App.—Amarillo Mar. 11, 2022, pet. filed) (mem. op.).

The contrasting holdings of the quoted cases support our conclusion that Dr. Davis's report is adequate. Dr. Davis's report outlines specific interventions that he contends should have been made and why the failure to implement those interventions caused the injury that he opines the records show that Thomas suffered. Because Dr. Davis's report contained the facts supporting his opinions on breaches of the standard of care and causation, its form met the requirements for an expert report specified in Section 74.351(r)(6) of the MLA. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). Thus, the trial court acted within its discretion by denying Eastland's motion to dismiss.

We overrule Eastland's first and second issues.

33

## IV.  Conclusion

Having overruled Eastland's two issues, we affirm the order of the trial court.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered:  December 8, 2022

34